[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 15-10779; 10-12957
_____

D.C. Docket No. 1:09-md-02036-JLK

THOMAS LARSEN, etc., et al.,

Plaintiffs,

DAVID JOHNSON,
on behalf of himself and all others similarly situated,

Plaintiff-Appellee,

versus

CITIBANK FSB, et al.,

Defendants,

KEYBANK NATIONAL ASSOCIATION,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(September 26, 2017)

Before TJOFLAT, JULIE CARNES and MELLOY,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiff David Johnson filed a putative class-action suit against Defendant KeyBank National Association in 2010, alleging that KeyBank improperly manipulated the order of debit card transactions in customer accounts in order to maximize collection of overdraft fees. This appeal relates not to the substance of Johnson's suit but to the enforceability of an arbitration provision contained in the agreement that governs Johnson's accounts with KeyBank. KeyBank seeks to compel arbitration of Johnson's substantive claims, while Johnson argues that the applicable arbitration provision is invalid against him. The district court denied KeyBank's motion to compel on grounds of unconscionability. KeyBank now appeals. Following oral argument and careful consideration of the record, we

---

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

2

reverse the district court's order and remand the case to the district court with instructions to compel arbitration.

## BACKGROUND

Johnson's relationship with KeyBank began in 1991, when he opened a checking account at Puget Sound Bank in Tukwila, Washington. KeyBank acquired Puget Sound Bank two years later and took over Johnson's checking account thereafter. Johnson has opened at least six additional deposit accounts with KeyBank since that time.

The underlying claims against KeyBank relate to a single checking account that Johnson has held jointly with his wife since 2001 (the "Joint Account"). In substance, Johnson argues that KeyBank improperly changed the sequence of debit card transactions from the Joint Account in order to maximize overdraft fees charged to the account. Johnson filed a class-action suit in 2010 in the United States District Court for the Western District of Washington. The case was transferred for pretrial purposes to a multidistrict proceeding pending in the Southern District of Florida under 28 U.S.C. § 1407. Johnson seeks to litigate this dispute as a class action in federal court, while KeyBank urges that Johnson's claims must be resolved through individual arbitration. It has been settled in this proceeding that, in light of the Supreme Court's holding in *AT&T Mobility LLC v.*

3

*Concepcion*, 563 U.S. 333 (2011), Johnson has waived his right to arbitrate on a class basis. *See In re Checking Account Overdraft Litigation*, 754 F. 3d 1290, 1293 (11th Cir. 2014).

The timing of the formation of the pertinent contractual relationship between Johnson and KeyBank is a threshold factual issue in this appeal. Johnson first opened the checking account as an individual customer in 1991, and he held the account individually for ten years before converting it in 2001 to a joint account with his wife. Although Johnson recalls few of the details surrounding the conversion of the individual account to the Joint Account, there is no dispute that he and his wife visited a KeyBank branch on October 11, 2001, and signed a signature card (the "2001 Signature Card") to effectuate the conversion.

The 2001 Signature Card characterizes the Joint Account as a "replacement" of Johnson's preexisting individual account. Importantly, by signing the 2001 Signature Card, Johnson and his wife confirmed their understanding that "all accounts opened under this Plan are subject to [KeyBank's] Deposit Account Agreement" and acknowledged receipt of a copy of that agreement. While there is no testimonial evidence that Johnson and his wife were, in fact, provided a copy of the agreement at the time they signed the 2001 Signature Card, the record does

4

reflect that it was standard KeyBank policy to provide a copy of that agreement to at least one of the parties to a joint account.

At the time, the governing agreement was KeyBank's June 2, 1997, deposit account agreement (the "1997 Agreement"), which contained an arbitration provision. The 1997 Agreement also preserved KeyBank's right to make unilateral changes to the terms of the Agreement after providing accountholders with appropriate notice, such as through so-called "statement messages" that KeyBank frequently mailed to customers along with their monthly account statements.

KeyBank has exercised this right of unilateral amendment several times since October 2001, and the deposit account agreement governing the Joint Account has evolved accordingly. The current version of the agreement—and the one on which Johnson bases his substantive claims—dates to December 2009 (the "2009 Agreement"). There are three features of the 2009 Agreement relevant to this appeal. First is, of course, the arbitration provision that Johnson now seeks to invalidate (the "2009 Arbitration Provision"). This provision has appeared in KeyBank's deposit account agreement in some form since at least 1995. Second is a choice-of-law provision, which specifies that Ohio law shall govern all disputes relating to customer accounts. Third is a change-in-terms provision, which

5

preserves KeyBank's right "to change or add to" the terms of the Agreement upon "such notice . . . as [KeyBank] determine[s] is appropriate."

KeyBank maintains that Johnson affirmatively agreed to the 1997 Agreement—including its arbitration provision—when he signed the 2001 Signature Card. That being so, the Joint Account has, at all times since its creation in 2001, been governed by a deposit account agreement that contains an agreement to arbitrate. As such, KeyBank concludes, Johnson is unequivocally bound by the 2009 Arbitration Provision, which is merely an updated version of the arbitration provision to which Johnson originally assented. KeyBank further contests the district court's conclusion that the 2009 Arbitration Provision is unenforceable under applicable state law.

Notwithstanding his written attestation confirming he had received the agreement, Johnson counters that he did not receive a copy of the 1997 Agreement at the time the account was formed and therefore did not bind himself to it upon signing the 2001 Signature Card. He further insists that he has not separately agreed to arbitrate at any point during the lifetime of the Joint Account. Instead, he argues, the Joint Account is governed by the earlier version of the KeyBank deposit account agreement governing his original individual account, which agreement lacked an arbitration provision altogether. Thus, Johnson argues that no

6

agreement to arbitrate exists between himself and KeyBank.  In the alternative, he argues that—even if an agreement to arbitrate exists between the parties—such an agreement is unconscionable and illusory under relevant state law.

KeyBank moved to compel arbitration in the district court on August 22, 2014.  In deciding this motion, the district court considered only two issues:  (1) whether the law of Washington or of Ohio governs the enforceability of the arbitration provision; and (2) whether, under applicable state law, the arbitration provision is unconscionable and therefore unenforceable.  The district court did not consider the threshold question of whether an agreement to arbitrate was formed in the first instance.

In its final analysis, the district court denied KeyBank's motion to compel arbitration, finding that Washington law governed the question of enforceability and that, under such law, the provision was unconscionable.  KeyBank has appealed from this order.  We now reverse the district court's decision and hold that arbitration must be compelled in this case.

## **STANDARD OF REVIEW**

We review a district court's denial of a motion to compel arbitration *de novo*.  *Collado v. J. & G. Transp., Inc.*, 820 F.3d 1256, 1259 (11th Cir. 2016).  We may affirm the district court's decision on any ground supported by the record.

7

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352, 1360 (11th Cir. 2011).

## DISCUSSION

The parties have raised several issues on appeal, only two of which were addressed by the district court below. We may decide each of the issues the parties have raised on *de novo* review, as the parties have been fully heard on the issues and the record is complete. *Walter v. Blue Cross & Blue Shield United of Wisconsin*, 181 F.3d 1198, 1202 (11th Cir. 1999). Considering each argument in turn, we find no ground on which to relieve Johnson of his commitment to arbitrate this dispute.

## I.    Existence of Agreement to Arbitrate

The threshold issue is whether, as a matter of contract formation, there exists an agreement between Johnson and KeyBank to arbitrate disputes relating to the Joint Account. It is well settled that "arbitration is a creature of contract." *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1221 (11th Cir. 2000) (quotation marks omitted); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). A court cannot compel parties to arbitrate their dispute in the absence of clear agreement to do so. *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004). In order "[t]o satisfy itself that such agreement exists," courts

8

must undertake to resolve any issues relating to the formation of the arbitration agreement, *Granite Rock Company v. International Brotherhood of Teamsters*, 561 U.S. 287, 297 (2010), as Johnson has asked us to do here.

The Supreme Court has made clear that this inquiry is a matter of state contract law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("[C]ourts generally . . . should apply ordinary state-law principles that govern the formation of contracts" in determining whether the parties have agreed to arbitrate.). *See also Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017) (confirming that state contract law governs the question whether an agreement to arbitrate exists); *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014) (same).[1] Thus, this Court's first task is to identify the applicable state law.

---

[1] Prior to the Supreme Court's instruction in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), this Court applied a "two-component test" to determine whether an agreement to arbitrate existed: the party seeking to avoid arbitration was required (1) to deny unequivocally that an agreement to arbitrate existed and (2) to provide evidence substantiating that denial. *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 817 (11th Cir. 1993); *see also Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 855 (11th Cir. 1992) (requiring the party denying the existence of arbitration agreement to substantiate that denial with "enough evidence to make the denial colorable").

As we recently explained in *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325 (11th Cir. 2016), we no longer rely on this test. *See id.* at 1330 ("[I]n the nearly quarter-century since *Chastain* and *Green*, no published decision of this Court has cited either case for the proposition that the burden is on the party denying the existence of an arbitration agreement to deny its existence 'unequivocally' and substantiate that denial with proof."). Instead, we defer solely to

9

### A.    Choice of Law

In a multi-district case transferred under 28 U.S.C. § 1407, the transferee court applies the choice-of-law rules of the state in which the action was filed. *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) (citing *Van Dusen v. Barrack*, 376 U.S. 612 (1964)). Johnson's banking relationship with KeyBank is based in Washington, and he initially filed suit in the United States District Court for the Western District of Washington. Thus, Washington's choice-of-law rules control where there is a potential conflict of laws.

In this case, the laws of two states potentially apply: Washington, the state in which Johnson's claims arose, and Ohio, the state agreed to in the parties' choice-of-law provision.[2] Washington courts enforce valid choice-of-law

---

applicable state-law principles in determining the quality and quantum of evidence required to deny or prove the existence of an agreement. *See, e.g.*, *id*. at 1334 (finding that defendant failed to meet its burden under Georgia law to prove the existence of the arbitration agreement it sought to enforce).

[2] The parties do not dispute the validity of the choice-of-law provision contained in the 2009 Agreement, which states: "This Agreement and all Accounts shall be governed by the laws of the State of Ohio (without regard for conflict of law rules) and applicable federal law, but with respect to all fees and charges related to your Account, federal law alone shall control."

As the district court correctly noted, the choice of Ohio law is proper given that KeyBank is headquartered in that state. *See McKee v. AT&T Corp.*, 191 P.3d 845, 8511 & n.6 (Wash. 2008) (noting that, in order for Washington courts to enforce the parties' contractual choice of law, the

10

agreements except in certain exceptional circumstances.  *See Schnall v. AT&T Wireless Servs., Inc.*, 259 P.3d 129, 131 (Wash. 2011) (noting that Washington courts "generally enforce contract choice of law provisions").[3]  The parties do not allege that any such circumstances exist here.  Indeed, Johnson asserts that there exists no material conflict between Washington and Ohio law on the issue of contract formation, and KeyBank does not disagree.  As a result, we look to Ohio law to determine whether Johnson agreed to arbitrate.[4]

## B.    Formation of Agreement

In Ohio, the essential elements of a contract include an offer, acceptance, contractual capacity of the parties, consideration, and a manifestation of mutual

---

parties must show that the chosen state has a substantial relationship to the parties or provide another reasonable basis for the choice) (citing Restatement (Second) of Conflict of Laws § 187).

[3]  Specifically, Washington courts will disregard contractual choice-of-law provisions and apply Washington law only where:  (1) Washington law would apply absent the provision; (2) application of the chosen state's law would violate a fundamental public policy of Washington; and (3) Washington's interest in the determination of the issue materially outweighs the interest of the chosen state.  *McKee*, 191 P.3d at 851.  *See also* 25 Wash. Prac., Contract Law and Practice § 5:18 (3d ed.).

[4]  Johnson broadly asserts that "Ohio and Washington law do not disagree on the requisites of contract formation" and proceeds to rely on case law from both states to support his contention that no agreement to arbitrate was formed.  Ohio and Washington law may indeed be in accord on many bedrock principles of contract law.  But because the parties have selected Ohio law— and because there are no grounds to disregard that choice on the issue of contract formation—we confine our analysis to Ohio law.

11

assent.  *See Rayess v. Educ. Comm'n for Foreign Med. Graduates*, 983 N.E.2d 1267, 1271 (Ohio 2012); 17 Ohio Jur. 3d Contracts § 7.

The element of mutual assent requires a "meeting of the minds as to the essential terms of the contract," the absence of which renders a contract unenforceable.  *Rayess*, 983 N.E.2d at 1271–72; *see also* 17 Ohio Jur. 3d Contracts § 15.  In assessing the existence of mutual assent in the consumer context, Ohio courts adhere to the "legal and common-sensical axiom that one must read what one signs."  *Mishler v. Hale*, 26 N.E.3d 1260, 1271 (Ohio Ct. App. 2014) (citing *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 579 (Ohio 1998)); *see also Ball v. Ohio State Home Servs., Inc.*, 861 N.E.2d 553, 556–57 (Ohio Ct. App. 2006) (finding homeowner bound to contract he knowingly declined to read).  This principle extends to consumers consenting to arbitration provisions in contracts of adhesion:  In Ohio, a consumer "of ordinary mind" is bound by an arbitration provision he has signed as long as he has had the opportunity to review it before assenting.  *See DeVito v. Autos Direct Online, Inc.*, 37 N.E.3d 194, 208 (Ohio Ct. App. 2015) (finding a "meeting of the minds" between consumer and auto dealer as to arbitration agreement where consumer had opportunity to read and understand terms of the agreement before signing) (citing *ABM Farms*, 692 N.E.2d at 574).

As such, Ohio courts have charged consumers with an affirmative "responsibility to learn the terms of [a] contract prior to agreeing" to them. *Moore v. Houses on the Move, Inc.*, 895 N.E.2d 579, 584 (Ohio Ct. App. 2008) (finding consumer bound to arbitration clause contained in construction contract despite her failure to read it). When the formation of a contract is at issue, the party asserting that a contract was formed bears the burden of establishing its existence. *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) (citing *Guardian Alarm Co. v. Portentoso*, 963 N.E.2d 225, 230 (Ohio Ct. App. 2011)).

### 1.    Johnson's Assent to the 1997 Agreement and Its Arbitration Provision

The parties identify several points during the lifetime of the Joint Account at which Johnson might have assented to the arbitration provision, but KeyBank's core contention is that the agreement to arbitrate arose in October 2001, when Johnson and his wife executed the 2001 Signature Card to convert Johnson's individual checking account to the Joint Account. Upon examination of Johnson's account documents, we agree.

The 2001 Signature Card, alternatively referred to as the "Account Express Plan," provided that "[t]his Plan is the signature card for all accounts *opened under this Plan*." (Emphasis added.) It further required signatories to attest to the following:

13

> I understand that *all accounts opened* under this Plan are subject to the Deposit Account Agreement.  I acknowledge receiving a copy of the agreement, and a written disclosure of the interest rate, annual percentage yield, fees and other terms and disclosures *relating to the account opened at the time this Plan was signed.*

(Emphasis added.)  Text at the top of the document signaled that the 2001 Signature Card functioned as a "Replacement" of the card associated with the preexisting account, while text at the bottom warned the customer that "[t]he information you are providing *to open your new KeyBank account* is subject to review."  (Emphasis added.)

There is no dispute that both Johnson and his wife signed the 2001 Signature Card in person in one of KeyBank's branch offices.  Moreover, the parties have produced no evidence to suggest that Johnson and his wife lacked an opportunity to read and understand this one-page document prior to signing it.

Arguably, the language with which KeyBank communicates to its customers the legal impact of a "replacement" card could be clearer, especially where an individual account is being converted to a joint account.  But in order to find an objective "meeting of the minds," Ohio courts ask only whether the terms of the agreement are clear and unambiguous on their face.  *See 216 Jamaica Ave., LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008) (citing *Nilavar v. Osborn*, 711 N.E.2d 726, 733 (Ohio Ct. App. 1998)).  And a straightforward

14

reading of the 2001 Signature Card makes clear that, in signing it, Johnson was displacing his individual account with a new incarnation of that account under new ownership. The account was plainly characterized as a "replacement" of the preexisting one—not merely a continuation of it. And the Card unambiguously authorized the "opening" of an account—not merely the modification of one. Given the clear terms of the document, Johnson was on notice that signing the 2001 Signature Card represented the start of a new contractual relationship with KeyBank.

This new contractual relationship was governed by a new deposit account agreement. Again, this fact was made plain on the face of the 2001 Signature Card, which stated that the account opened thereunder would be "subject to the Deposit Account Agreement." In October 2001, new accounts opened at KeyBank were governed by the 1997 Agreement, complete with its arbitration provision. There is little question that, under Ohio law, the Card's "subject to" language was sufficient to incorporate the 1997 Agreement—along with its arbitration provision—into the 2001 Signature Card by reference, even if a copy of the Agreement was not provided to Johnson at the time he signed the Card. *See, e.g.*, *Blanchard Valley Farmers Coop., Inc. v. Carl Niese & Sons Farms, Inc.*, 758 N.E.2d 1238, 1244–45 (Ohio Ct. App. 2001) (finding language that purchase was

15

made "subject to" relevant trade rules sufficient to incorporate those trade rules—including their arbitration provision—into sales contract); *Int'l Bhd. of Elec. Workers, Local Union No. 8 v. Gromnicki*, 745 N.E.2d 449, 452 (Ohio Ct. App. 2000) (concluding that, where incorporation of external document by reference was "apparent" from language of contract, signatory to the contract was bound to the external document and noting that "[t]he fact that the contract comprised more than one document [was] irrelevant"). *See also Moore*, 895 N.E.2d at 584–85 (noting that, under Ohio law, even a non-signatory to an arbitration agreement may be bound to it under the doctrine of incorporation by reference). Thus, the 1997 Agreement became effective as to the Joint Account at the time Johnson signed the 2001 Signature Card.[5]

Johnson challenges this interpretation of the 2001 transaction on two grounds. First, he argues that the creation of the Joint Account was a mere continuation of Johnson's preexisting account, meaning that it was governed by an earlier version of the deposit account agreement that lacked an arbitration provision altogether. As explained above, the signature card alerted the signatory

---

[5] It is worth noting that Johnson selectively misreads the plain language of the 2001 Signature Card, insisting that the Card "merely acknowledged receipt of a separate agreement" and "did not use 'subject to' language, or anything like it." This assertion is plainly wrong, rendering his reading of the contract—and the argument based thereon—careless at best and disingenuous at worst.

16

that this was a new account.  Further, as a longtime KeyBank customer, Johnson

knew that the terms governing his accounts with KeyBank were not set in stone.[6]

He was thus on notice that a new version of the deposit account agreement, which

incorporated terms different from the ones he had agreed to in the past, might

apply to the newly formed Joint Account he opened in 2001.  Finally, Johnson was

alerted as early as 1993 that the act of signing a signature card at KeyBank could

have the effect of binding him to the terms of the applicable deposit account

agreement.[7]  Thus, Johnson's insistence that he "did not *agree* to anything" by

signing the 2001 Signature Card rings hollow.  Because Johnson had a basic

awareness of the implications of signing the 2001 Signature Card, he had a

responsibility under Ohio law to make himself aware of the terms of the applicable

agreement before signing them.  *See Moore*, 895 N.E.2d at 584 (establishing that a

---

[6]  Johnson was aware as early as 1991 that the terms of the agreement governing his account with KeyBank were subject to periodic amendment.  The deposit account agreement Johnson signed in 1991, when he first opened an account with KeyBank's predecessor, provided:  "We may change these Rules at any time after providing notice through written posting in the lobby of the bank."

[7]  The version of the deposit account agreement that became effective in 1993, when KeyBank acquired Puget Sound Bank and took over Johnson's preexisting account, stated on its first page that "[b]y accepting a copy of these Rules, *signing your deposit account signature card*," and "continuing your account, you agree to be bound by these Rules, the Signature Card and any subsequent amendments to either."  (Emphasis added.)  The parties do not dispute that Johnson received this early version of the deposit account agreement and agreed to its terms.

17

consumer "entering [into] a contract has a responsibility to learn the terms of the contract prior to agreeing to [them]").

Second, Johnson argues that even if the 1997 Agreement was the operable contract at the time, he did not assent to it because he did not receive a copy of it when he signed the 2001 Signature Card. This argument leans on a very thin reed. Specifically, Johnson testified only to the absence of any memory, one way or another, whether he received a copy of the agreement: "I have no recollection if I was or wasn't given a copy (of the applicable deposit account agreement)." In trying to transform his "I don't remember" testimony to an "I didn't receive" assertion, Johnson cites to the testimony of a KeyBank employee, Rosemary Klee, who stated that "on a joint account . . . we only have to give the [deposit account agreement] to one of the parties." Johnson misconstrues and misquotes this testimony.[8] If anything, the procedure Ms. Klee describes makes it more, rather than less, likely that Johnson was given a copy of the 1997 Agreement when he signed the 2001 Signature Card. Furthermore, by signing the 2001 Signature Card, Johnson attested that he had "received a copy of the agreement . . . relating to the

---

[8] Specifically, Johnson states in his brief that, according to Ms. Klee, "it was not 'standard policy' for KeyBank to give the agreement '[t]o either party'" to a joint account. To the contrary, Ms. Klee's testimony suggests only that it was not standard policy for KeyBank to give the agreement to *both* parties when a joint account was formed. Disclosure to one of the parties sufficed.

18

account opened at the time [the Card] was signed." Johnson's failure to remember any details of the October 11, 2001, transaction is obviously not sufficient to rebut the inference we draw from his written, contemporaneous acknowledgement of receipt.

Finally, whether Johnson was handed a copy of the deposit account agreement that would govern the Joint Account and that was incorporated by reference into the 2001 Signature Card is, ultimately, irrelevant: A consumer of "ordinary mind" has an obligation to "read what [he] signs." *ABM Farms*, 692 N.E.2d at 579. If we permitted Johnson to evade the commitment to arbitrate by claiming he did not investigate the terms to which his new account was subject before signing the 2001 Signature Card, few deposit agreements would ever be enforceable. *See id.* (citing *Upton v. Tribilcock*, 91 U.S. 45, 50 (1875)).

By providing uncontroverted evidence of Johnson's execution of the 2001 Signature Card, KeyBank has met its burden of establishing that Johnson consented to the arbitration provision incorporated by reference therein. *See Advance Sign Grp., LLC*, 722 F.3d at 784 (citing *Portentoso*, 963 N.E.2d at 230).

### 2.    Johnson's Assent to the 2009 Arbitration Provision

The 1997 Agreement provided that KeyBank "reserve[s] the right to change the terms of this Agreement . . . at any time" after providing "such notice of the

19

change as we determine is appropriate, such as by statement message or enclosure." We have concluded that Johnson agreed to the arbitration provision contained in the 1997 Agreement. KeyBank exercised its revision right in June 2004, when it included with Johnson's account statement a revised version of the arbitration provision that would "apply to [the Joint Account] unless you notify us in writing . . . that you reject the Arbitration Provision," along with a "statement message" explaining Johnson's options (the "2004 Statement Message").

Johnson did not object to this or any subsequent revision to the arbitration provision applicable to the Joint Account. Instead, he continued to use his account under the newly revised terms. As such, his argument that he did not assent to the revised version of the arbitration provision that appears in the 2009 Agreement— the very agreement on which his substantive claims are now based—must fail.

## C.    Necessity of Trial

"At worst," Johnson finally argues, he is entitled to a jury trial on the question whether an agreement to arbitrate was formed. He hangs this argument on section 4 of the Federal Arbitration Act (the "FAA"), which governs the 2009

Arbitration Provision[9] and states that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

We recently joined our sister circuits in holding that a summary judgment–like standard is appropriate in determining whether a trial is necessary under section 4 of the FAA. *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). According to this standard, a court may conclude as a matter of law that parties entered into an arbitration agreement only if "there is no genuine dispute as to any material fact" concerning the formation of the arbitration agreement. *Id.* (citing Fed. R. Civ. P. 56(a)). When there is no such dispute, a trial is unnecessary. *Id*. at 1332 (declining to provide losing party with "a second bite at the apple" by granting trial on the existence of an arbitration agreement where no genuine fact dispute existed).

The only potential factual dispute to which Johnson alludes is the question whether KeyBank provided Johnson with a copy of the applicable deposit account agreement at the time he signed the 2001 Signature Card. But, as discussed above,

---

[9] The 2009 Arbitration Provision is governed by the FAA because the loan agreement was executed via interstate commerce. *See* 9 U.S.C. § 2; *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015).

21

Johnson does not claim that he did not receive the document, nor does he present any evidence to suggest as much. He merely asserts that he cannot recall whether he received a copy of that document. His lack of memory is insufficient to create a genuine dispute of fact. And anyway, as our analysis above demonstrates, his physical receipt of a copy of the document at that time is not crucial to our finding that his signature on the 2001 Signature Card bound him to the 1997 Agreement. Thus, summary judgment is warranted.

## II.    Enforceability of Agreement to Arbitrate

KeyBank next argues that the district court erred in finding the 2009 Arbitration Provision unenforceable under applicable state law. We agree that the court erred.

The 2009 Arbitration Provision is governed by the FAA because the loan agreement was executed via interstate commerce. *See* 9 U.S.C. § 2; *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015). "The FAA places arbitration agreements on equal footing with all other contracts and sets forth a clear presumption—'a national policy'—in favor of arbitration." *Parnell*, 804 F.3d at 1146 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). Where an agreement to arbitrate has been formed, the court must treat the agreement as "valid, irrevocable, and enforceable, save upon such grounds as exist

22

at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, an agreement can be "defeated by fraud, duress, unconscionability, or another 'generally applicable contract defense.'" *Parnell*, 804 F.3d at 1146 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67–68 (2010)). Johnson seeks to defeat the 2009 Arbitration Provision by arguing that it is unconscionable and illusory under applicable common law. We review each argument *de novo*.

### A.    Choice of Law

We must address whether the law of Washington (the state where the Joint Account is held) or Ohio (the state of the parties' contractual selection) governs Johnson's enforceability challenges. As explained above, Washington's rules instruct us to enforce the parties' choice of Ohio law even if it conflicts with Washington law, unless application of Ohio law would violate a fundamental public policy of Washington. *See McKee v. AT&T Corp.*, 191 P.3d 845, 851 (Wash. 2008).

Washington and Ohio law do differ as to the requirements for proving unconscionability as an enforcement defense, with Washington setting out an easier test for one asserting that an agreement is unconscionable. Ohio law requires Johnson to prove that the 2009 Arbitration Provision is both procedurally

23

and substantively unconscionable before it can be struck down. *See Hayes v. Oakridge Home*, 908 N.E.2d 408, 412 (Ohio 2009) ("The party asserting unconscionability of a contract bears the burden of proving that the agreement is both procedurally and substantively unconscionable."). Under Washington law, however, an agreement may be invalidated on a showing of either substantive or procedural unconscionability. *See Gandee v. LDL Freedom Enters., Inc.*, 293 P.3d 1197, 1199 (Wash. 2013) (noting that either substantive or procedural unconscionability is enough to void an agreement in Washington); *Gorden v. Lloyd Ward & Assocs., P.C.*, 323 P.3d 1074, 1079–80 (Wash. Ct. App. 2014) (invalidating agreement as procedurally unconscionable and declining to address substantive unconscionability because "our analysis is done").

In relevant part, the district court found that to apply Ohio law in this context—that is, to require Johnson to demonstrate that the 2009 Arbitration Provision is both procedurally and substantively unconscionable—"would violate Washington's public policy of invalidating a contract on a finding of either procedural or substantive unconscionability." Having found the 2009 Arbitration Provision to be substantively unconscionable, the district court therefore concluded that it was unenforceable under Washington's "either/or" unconscionability standard.

24

The district court's determination that application of Ohio's test for unconscionability would violate Washington's public policy hinges on an analysis of the nuances of the latter state's public-policy goals in the context of contract enforcement. This is a subject, however, on which Washington courts have provided little guidance, and Keybank strongly disagrees with the district court's conclusion. Nevertheless, we do not find it necessary to decide this question. Even assuming that, under these circumstances, Washington law would require application of its own test for unconscionability, instead of Ohio's, we conclude that the 2009 Arbitration Provision is neither procedurally nor substantively unconscionable, rendering it enforceable under both Washington and Ohio law. Similarly, we need not inquire into the difference between Washington and Ohio law respecting Johnson's final argument that the 2009 Arbitration Provision is illusory, as we do not find it illusory under either state's standard.

## A.    Unconscionability

We first assess the conscionability of the 2009 Arbitration Provision. We conclude that the 2009 Arbitration Provision was not formed in a procedurally unconscionable manner under either Washington or Ohio law. That conclusion ends any challenge by Johnson on the ground of unconscionability under Ohio law. As to Washington's requirement that an agreement can be struck if it is only

25

substantially unconscionable, we conclude that all but one of the at-issue portions of the Provision are substantively conscionable under Washington law, and we sever this one unconscionable provision.

### 1.    Procedural Unconscionability

The courts of both Washington and Ohio characterize procedural unconscionability as the absence of "meaningful choice" as to the terms of the agreement in light of all the circumstances surrounding the transaction. *See Gorden*, 323 P.3d at 1079; *Hayes*, 908 N.E.2d at 412. Deciding this question is a fact-intensive inquiry. Washington courts take a broad view of the facts, examining "the manner in which the contract was entered, whether each party had reasonable opportunity to understand the terms of the contract, and whether the important terms were hidden in a maze of fine print." *Gorden*, 323 P.3d 1079 (citing *Nelson v. McGoldrick*, 896 P.2d 1258 (Wash. 1995)) (internal quotation marks and alterations accepted). Ohio courts consider a narrower range of factors, examining "age, education, intelligence, business acumen and experience" to determine whether the "weaker party" was able to protect his interests. *Taylor Bldg. Corp. of Am. v. Benfield*, 884 N.E.2d 12, 22–23 (Ohio 2008).

26

There are two transactions between KeyBank and Johnson that warrant examination for procedural conscionability.  The first is the signing of the 2001 Signature Card on October 11, 2001, which, we have held, bound Johnson to the 1997 Agreement and the arbitration provision contained therein.  The second is the 2004 modification of that arbitration provision, notice of which was mailed to Johnson via the 2004 Statement Message before the modification took effect.  We analyze them separately.

          i.     *Johnson's Assent to the 1997 Agreement and Its Arbitration Provision*

It is well settled in Washington and Ohio that contracts of adhesion are not procedurally unconscionable per se.  *See Zuver v. Airtouch Commc'ns, Inc.*, 103 P.3d 753, 760 (Wash. 2004) ("[T]he fact that an agreement is an adhesion contract does not necessarily render it procedurally unconscionable."); *Benfield*, 884 N.E.2d at 24 ("[E]ven a contract of adhesion is not in all instances unconscionable per se," as standardized contracts "can provide advantages to consumers.").  Nor does the existence of unequal bargaining power alone justify a finding of procedural unconscionability; instead, the "key inquiry" remains whether the party lacked a meaningful choice in assenting to the relevant terms.  *Romney v. Franciscan Med. Grp.*, 349 P.3d 32, 38 (Wash. Ct. App. 2015).  *See also Zuver*, 103 P.3d at 761; *Hayes*, 908 N.E.2d at 412–13.

27

The parties agree that the deposit account agreement is a contract of adhesion that was presented to Johnson on a take-it-or-leave-it basis when he opened the Joint Account.  Johnson concedes that this fact alone does not prove procedural unconscionability.  He maintains, however, that he "had no 'meaningful choice' but to be bound" by the arbitration provision because it was a boilerplate term that he (1) was not given the opportunity to review before opening the Joint Account and (2) was not invited to strike from the agreement before he signed it.[10]

Much of Johnson's argument with respect to the 2001 transaction relies on his unsubstantiated contention that he did not receive a copy of the 1997 Agreement at the time he signed the 2001 Signature Card.  As discussed above, Johnson had an opportunity and an incentive to inquire about and review the 1997 Agreement, including its arbitration provision, before confirming his understanding that the Joint Account would be "subject to" its terms.  And in the absence of evidence to the contrary, we have no reason to disregard his

---

[10]  Johnson does not contend that his age, intelligence, business acumen, or experience—significant factors in Ohio's procedural-unconscionability analysis, *see Benfield*, 884 N.E.2d at 22–23—prevented him from making a meaningful choice when he signed the 2001 Signature Card.  In fact, Johnson engaged in continuous banking business with KeyBank over the course of almost ten years before assenting to the 1997 Agreement, leaving him with extensive exposure to the standard procedures by which KeyBank managed customer accounts.  *Cf., e.g.*, *Porpora v. Gatliff Bldg. Co.*, 828 N.E.2d 1081, 1084 (Ohio Ct. App. 2005) (finding adhesive construction contract procedurally unconscionable because, among other reasons, consumers had no previous experience reviewing construction contracts).

28

acknowledgement on the 2001 Signature Card that he had received a copy of the agreement relating to the Joint Account. *Cf., e.g.*, *Swayze v. The Huntington Inv. Co.*, No. 20630, 2005 WL 1208116, at \*1–5 (Wash. Ct. App. May 20, 2005) (finding no procedural unconscionability under Ohio law—in spite of investor's contention that he never received a copy of the agreement—because investor had signed a statement confirming receipt of agreement). Testimony offered by KeyBank supports our conclusion that Johnson did indeed have an opportunity to read and understand the terms of the 1997 Agreement when he opened the Joint Account.[11]

If Johnson had used this opportunity to review the 1997 Agreement, he would have been alerted to the presence of an arbitration provision. The table of contents of the 1997 Agreement lists "Arbitration; Waiver of Jury Trial" as one of twenty-eight sub-sections and directs the reader to page eleven of the agreement. The clause itself appears on a single page, set off in a new paragraph that bears the title "Arbitration; Waiver of Jury Trial" in bold-faced type. The remainder of the provision's text appears in the same type as every other term in the agreement.

---

[11] As noted *supra*, a representative of KeyBank testified that "on a joint account . . . the policy procedure is [that] we only have to give the [deposit account agreement] to one of the parties" on the account.

29

Having reviewed this 1997 Agreement, we do not find the arbitration provision so "hidden in a maze of fine print" that Johnson was precluded from exercising meaningful choice before assenting to it. Even a cursory scan of the table of contents would put the average customer on inquiry notice of the existence and implications of the provision, including the waiver of a jury trial. *Cf., e.g.*, *Zuver*, 103 P.3d at 761 (declining to find arbitration agreement "hidden" despite the fact that it was buried within "five other attachments," primarily because "the agreement was clearly labeled," its terms "were in normal typeface and font," and the provision "was only one page long"); *Benfield*, 884 N.E.2d at 23 (finding no procedural unconscionability, even though the contract was pre-printed and the arbitration provision was offered on take-it-or-leave-it basis, where provision "appeared in standard, rather than fine, print and was not hidden").

Furthermore, there is no support in Washington or Ohio law for the contention that a consumer may not be bound by a term contained within a standardized adhesion contract merely because he has not been offered an opportunity to opt out of that provision. *See, e.g.*, *Townsend v. Quadrant Corp.*, 224 P.3d 818, 827–28 (Wash. Ct. App. 2009) (finding the fact that arbitration provision "was a boilerplate provision and could not be deleted from the agreement" to be "insufficient to establish procedural unconscionability");

30

*Benfield*, 884 N.E.2d at 24 (concluding that at-issue contract was adhesive in light of "stronger party's refusal to negotiate [the] key term" of arbitration, but declining nonetheless to find procedural unconscionability given the advantages of form contracts and the fact that few such contracts "are negotiated one clause at a time") (citing *Carbajal v. H&R Block Tax Servs., Inc.*, 372 F.3d 903, 906 (7th Cir. 2004)).

We conclude that the manner in which Johnson assented to the 1997 Agreement and its terms was procedurally conscionable under both Washington and Ohio law.[12]

> ii.    *Johnson's Failure to Opt Out of the 2004 Amendment to the Arbitration Provision*

Johnson further challenges the conscionability of KeyBank's 2004 amendment to the arbitration provision.  First, we note that even if his argument on this point had merit, it would not relieve him of his obligation to arbitrate in light of our findings, *supra*, that Johnson is bound by the arbitration provision contained

---

[12]  We are mindful of the Supreme Court's instruction that, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye*, 546 U.S. at 446.  *See also Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 998 (11th Cir. 2012) (confirming that broad challenges to the formation of agreement as a whole—as opposed to specific challenges to arbitration provision contained therein—must be decided by the arbitrator and not the court).  We have found only that the arbitration provision contained in the 1997 Agreement is not procedurally unconscionable.  To the extent Johnson attacks the execution of the 1997 Agreement as a whole as procedurally unconscionable, we leave his challenge for the determination of the arbitrator.

31

in the 1997 Agreement and that the manner in which he agreed to it was procedurally conscionable.  At most, his argument would invalidate the 2004 amendment—not the agreement to arbitrate itself.  Nonetheless, we conclude that the 2004 amendment to the arbitration agreement was carried out in a procedurally conscionable manner.

Johnson's June 2004 account statement, which KeyBank sent directly to Johnson's mailing address, enclosed a document entitled "Information About Your Accounts."  Printed on that document was a series of messages clarifying key terms of the account.  The first page of the document bears the following text:

> **NOTICE OF AMENDMENT TO DEPOSIT ACCOUNT AGREEMENT AND FUNDS AVAILABILITY POLICY**
>
> This notice informs you of changes to the Deposit Account Agreement . . . that will be effective and will apply to your Account as of October 1, 2004.  This Arbitration Provision replaces any existing arbitration provision in your Agreement.  You have the right to reject the changes to the Agreement as explained below.

The notice continues on the next page:

> **NOTICE OF AMENDMENT TO DEPOSIT ACCOUNT AGREEMENT AND FUNDS AVAILABILITY POLICY** (*continued*)
>
> The enclosed Arbitration provision will apply to your Account(s) unless you notify us in writing by November 1, 2004 that you reject the Arbitration Provision. . . . Rejection of this Arbitration Provision does not serve as rejection of any other term or condition of your Agreement with us governing your Account(s).  Your continued use of your Account(s) is

deemed to be your acceptance of this amendment, unless you opt-out as described above.

Enclosed with the statement message was a pamphlet titled "KeyBank Arbitration Provision." The cover of the pamphlet bears the following text:

> NOTICE OF RIGHT TO REJECT ARBITRATION PROVISION. PLEASE SEE YOUR STATEMENT FOR IMPORTANT INFORMATION CONCERNING YOUR RIGHT TO REJECT THIS ARBITRATION PROVISION. PLEASE RETAIN THIS DOCUMENT FOR YOUR RECORDS.

The remaining two pages of the pamphlet print in full the amended arbitration agreement that KeyBank sought to incorporate into its deposit account agreement.

Together, this informational sheet and pamphlet comprise the 2004 Statement Message, which KeyBank mailed to Johnson along with his account statement in June 2004. The deposit account agreement thus authorized KeyBank to make unilateral amendments as long as notice was provided to accountholders through precisely this sort of "statement message."

In short, there is no viable argument under Washington or Ohio law that KeyBank's use of the 2004 Statement Message was procedurally unconscionable. The bold and capitalized type in which the amendment was announced is sufficient in Washington and Ohio to alert a consumer to the existence and importance of an arbitration provision. *See, e.g.*, *Zuver*, 103 P.3d at 761; *Benfield*, 884 N.E.2d at 23. No element of the amendment was concealed from Johnson's view or "buried" in

33

voluminous documentation.  The opt-out instructions and text of the amendment itself were complete and presented in ordinary, not "fine," print.  Johnson had ample time to review the amendment, understand its terms, and consult counsel before the amendment took effect.  Furthermore, the existence of an opt-out provision strongly weighs against a finding of procedural unconscionability.  *See, e.g.*, *Mayne v. Monaco Enters., Inc.*, 361 P.3d 264, 268 (Wash. Ct. App. 2015) (finding that arbitration agreement was "not adopted in an unconscionable manner" under Washington law because a thirty-day opt-out provision "ensured that [employee's] decision to sign the arbitration agreement was a voluntary and meaningful choice").

In light of the text of the 2004 Statement Message and its opt-out procedure, the 2004 amendment to the arbitration provision was not enacted in a procedurally unconscionable manner under applicable law.  Nor does Johnson argue that any subsequent transactions with KeyBank were procedurally unconscionable.  As such, he has not shown any procedural unconscionability with respect to the currently operable 2009 Arbitration Provision, which encompasses the changes made in 2004.  Thus, as the 2009 Arbitration Provision is not procedurally unconscionable, it passes muster under Ohio law.

2.    Substantive Unconscionability

34

Even though the 2009 Arbitration Provision is not procedurally unconscionable under Washington law, we must still determine whether it is substantively unconscionable, as Washington law will invalidate a contractual provision if it is either procedurally <u>or</u> substantially unconscionable.

Washington courts, like many other courts, invoke a series of hazy expressions to pinpoint the concept of substantive unconscionability:  A term that is "one-sided," "shocking to the conscience," "overly harsh," "monstrously harsh," or "exceedingly calloused" may be substantively unconscionable in Washington. *See Gandee*, 293 P.3d at 1199–200 (citing *Adler v. Fred Lind Manor*, 103 P.3d 773, 781 (Wash. 2004)) (internal quotation marks and brackets omitted).  These attributes must be examined in light of all the circumstances present at the time the contract was formed.  *See, e.g.*, *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 940–41 (9th Cir. 2009) (noting that, under Washington law, "the relevant clause must be substantively unconscionable at the time of contracting") (citing *M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d 305, 315 (Wash. 2000) and *Adler*, 103 P.3d at 788).  Finally, unconscionable terms are severed from the applicable agreement wherever possible.  *Woodward v. Emeritus Corp.*, 368 P.3d 487, 496 (Wash. Ct. App. 2016) (citing *Gandee*, 293 P.3d at 1201–02).

35

Johnson characterizes five distinct elements of the 2009 Arbitration Provision as substantively unconscionable. With one exception, we disagree with his characterizations. Nevertheless, this one "unconscionable" clause is readily severable from the broader agreement to arbitrate and thus does not defeat KeyBank's motion to compel.

### i.    Arbitration Costs

While the parties devote the majority of their substantive-unconscionability arguments to the issue of arbitration costs, neither party paints a clear picture of the cost-allocation framework that would apply to Johnson's claims. We start by clarifying that picture.

The allocation of costs under the 2009 Arbitration Provision depends in part on the arbitral forum in which the claim is brought. Specifically, any claim brought under the Provision is to be administered by either the American Arbitration Association (the "AAA") or Judicial Arbitration and Mediation Services, Inc. ("JAMS") according to the rules in place at the chosen forum "at the time the Claim is filed." The consumer has complete power to select which organization will administer the arbitration, regardless of whether he initiates the

arbitration himself or KeyBank compels arbitration of a claim that he initially filed in court.[13]

In either scenario, the 2009 Provision reduces the consumer's filing-fee burden and limits his expected costs of arbitration. First, it provides that KeyBank will reimburse the claimant "all fees up to $100.00 charged by the arbitration administrator" once the claimant has paid an amount equivalent to the applicable court filing fee. All the consumer must do is make a written request for reimbursement. Second, it provides that:

> If you are required to pay any fees in excess of $100.00 to the arbitration administrator [ ], we will consider a request by you to pay all or part of the additional fees. To the extent that we do not approve your request, the arbitrator will decide whether we or you will be responsible for paying any such additional fees.

An illustration is helpful. The parties do not dispute that, if Johnson chose to arbitrate via JAMS, the JAMS Consumer Arbitration Policy that became effective in July 2009 would apply.[14] That policy articulates the following

---

[13] Even if KeyBank seeks to initiate arbitration against the consumer, the consumer has twenty days to select which forum he would like KeyBank to use. The consumer therefore has significant control over the choice of forum.

[14] The parties dispute which version of the AAA rules would apply and how such rules would impact the allocation of costs. We focus only on JAMS rules for purposes of this example, but we note that we see no evidence in the record that AAA rules regarding consumer cost allocation differ meaningfully from JAMS rules.

37

"minimum standard of fairness": "[T]he only fee required to be paid by the consumer is $250, which is approximately equivalent to current Court filing fees. All other costs must be borne by the company including any remaining JAMS Case Management Fee and all professional fees for the arbitrator's services." In fact, JAMS will not administer any consumer arbitration unless fees are allocated in accordance with this standard. The 2009 Arbitration Provision provides contact information for each arbitral forum so that consumers can access and read rules like this one before they decide where to bring their claims.

Thus, had Johnson pursued his claim against KeyBank in arbitration under the applicable JAMS rules, he would have been required to pay only $150: the $250 consumer filing fee collected by JAMS, less the $100 reimbursement from KeyBank to which he is entitled under the Arbitration Provision. This is a lesser financial outlay than the $350 he was required to pay to file a civil action in the Western District of Washington.

In short, the cost of using the JAMS arbitral forum is absolutely capped at the initial filing fee, as JAMS rules shield consumers entirely from "all other costs" of arbitration, including the arbitrator's professional fees. Such costs would be borne exclusively by KeyBank. The consumer's option to negotiate with KeyBank

for additional reimbursement and to appeal to the arbitrator for the same further reduces the expected cost of access to the JAMS forum.

Johnson has not argued that JAMS is an unsuitable or unfavorable arbitral forum. In fact, there is no reason to believe that a consumer contemplating a dispute with KeyBank would have reason to be concerned about the JAMS cost-allocation framework, given its limitations and predictability. Even if the AAA rules imposed a prohibitive cost-allocation framework,[15] the consumer deciding where to pursue his claim would be empowered and properly incentivized to choose JAMS instead. Moreover, under the terms of the 2009 Provision, the consumer is not exposed to the risk of "loser pays" cost shifting: If KeyBank prevails, the consumer is "not required to reimburse [KeyBank]" for any fees paid regardless of which organization administers the dispute.

With no mention of the JAMS rules we have discussed here, Johnson argues that the costs associated with arbitrating his case would be prohibitive and render the 2009 Arbitration Provision unconscionable. The district court agreed, relying on the erroneous assumption that neither the AAA nor the JAMS rules impose any

---

[15]  To reiterate, the parties dispute which AAA rules would apply in Johnson's case, and we make no finding as to the applicable AAA cost-allocation framework. But again, we see no evidence to suggest that such rules would prohibit a consumer's access to the AAA forum.

39

predictable limit on the costs Johnson would face in arbitration. Instead, the court assumed, the arbitrator would enjoy full discretion to allocate costs as he or she sees fit, and this potential unpredictability would be "enough to deter a plaintiff from bringing an individual claim." Even if this were true under AAA rules, the district court's position does not square with the straightforward JAMS rule framework, which would force KeyBank to pay the bulk of arbitration costs and would strictly limit Johnson's personal outlay.

We also note that the JAMS Consumer Arbitration Policy took effect five months before the 2009 Arbitration Provision was formed. This means that, "at the time of contracting," the 2009 Provision provided Johnson with a clear opportunity to pursue arbitration in a cost-feasible manner. Further, the time of contracting is the only point in time that matters in substantive unconscionability analysis under Washington law. *See Kam-Ko Bio-Pharm Trading*, 560 F.3d at 940–41.

Given that arbitrating under JAMS rules has been an option for Johnson since 2009, the cost-sharing aspects of the 2009 Arbitration Provision cannot be characterized as harshly one-sided or prohibitive under Washington law. *Cf., e.g.*, *Gandee*, 293 P.3d at 1200–01 (invalidating "loser pays" provision because the risk that costs might shift to the consumer in the event his claim failed "effectively

40

chill[ed]" his willingness to bring suit; as a result, the provision was "one-sided and overly harsh").

Furthermore, under Washington law, the party challenging a fee-splitting provision must provide specific information about the arbitration fees it would be required to pay and describe why those fees would be prohibitive. *See Hill v. Garda CL Nw., Inc.*, 308 P.3d 635, 639 (Wash. 2013). Johnson has provided no reason why he is unable to take advantage of the favorable cost-allocation framework provided by JAMS rules, and there is no evidence to suggest that a cost of $150 would prohibit Johnson from pursuing his claim in arbitration at this stage. There are, therefore, no grounds on which to hold this provision substantively unconscionable.

### ii.    Attorneys' Fees

Johnson also challenges the attorneys' fees clause of the 2009 Arbitration Provision, which provides that "[e]ach party shall bear the expense of that party's attorneys', experts', and witness fees, regardless of which party prevails in the arbitration, unless applicable law and/or this Agreement gives a party the right to recover any of those fees from the other party."

This clause tracks the "American rule" of fee splitting, which Washington courts have long embraced. *Cosmopolitan Eng'g Grp., Inc. v. Ondeo Degremont,*

41

*Inc.*, 149 P.3d 666, 669 (Wash. 2006) ("[T]he general rule in Washington, commonly referred to as the American rule, is that each party in a civil action will pay its own attorney fees and costs."). Johnson has not provided any evidence that any "applicable law" or any other element of the 2009 Agreement would entitle KeyBank to recover attorneys' fees from Johnson. As a result, we do not find the attorneys' fees clause unconscionable under Washington law.

### iii. *Discovery*

A discovery clause in the 2009 Arbitration Provision states: "There shall be no pre-arbitration discovery except as provided for in the applicable Arbitration Rules"—that is, the rules of the AAA or JAMS, depending on Johnson's election. Johnson argues that the discovery clause is "severely one-sided" because KeyBank has "all" the documents necessary for Johnson to prove his claims.

We start with *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), in which the Supreme Court cautioned that clauses limiting discovery in arbitration— much like class-action waivers—cannot be rejected as categorically unconscionable under state law without running afoul of the FAA's pro-arbitration mandate. *See id.* at 339, 341–44. Even if the clause at issue here limited Johnson's discovery options in a meaningful way, it would not be substantively unconscionable on that basis alone.

42

In fact, KeyBank's discovery clause does not limit discovery in any meaningful way. We first reiterate that, under the 2009 Provision, Johnson is entitled to choose whether AAA or JAMS rules (and their accompanying discovery procedures) apply. He contends that discovery would be unfavorably limited only under the AAA rules, failing (again) to mention the alternative JAMS framework. In fact, under its Consumer Arbitration Policy, JAMS refuses to administer any arbitration that would not allow for the discovery of information relevant to the dispute. Johnson remains free to proceed under this JAMS rule if he so chooses.

Furthermore, even under the AAA rules, and contrary to Johnson's assertion, discovery in that forum would be conducted at the discretion of the arbitrator, who is instructed by the AAA Consumer Due Process Protocol that "No party should ever be denied the right to a fundamentally-fair process due to an inability to obtain information material to a dispute."[16]

In short, nothing in the record suggests that an arbitrator applying AAA or JAMS rules would be empowered to limit discovery in a manner that would render

---

[16] Johnson incorrectly contends that, under the applicable AAA rules, he "would not be entitled to any discovery other than KeyBank's exhibit list." This assertion is simply not supported by the text of the AAA rules. Those rules provide: "At the request of any party or at the discretion of the arbitrator . . . the arbitrator may direct [ ] the production of documents and other information." Even if the AAA's streamlined "Expedited Procedures" for consumer cases were to apply, they do not modify or replace this baseline discovery rule.

43

the Provision unconscionable.  *Cf., e.g.*, *Cockerham v. Sound Ford, Inc.*, No. C06-1172JLR, 2006 WL 2841881, at *3 (W.D. Wash. Sept. 29, 2006) (declining to find discovery clause that allowed each side to take one deposition and granted discretion as to remaining discovery to arbitrator unconscionable under Washington law).

Finally, Johnson's concern that KeyBank holds "all" the evidence relevant to the dispute seems overstated.  That is, Johnson's substantive claims relate to the temporal ordering of debit-card transactions within the Joint Account, and Johnson could conceivably make his case on the basis of account records alone.  As such, the scope of discovery necessary in this case may, in reality, prove minimal—and Johnson is likely already in possession of the critical account records.  Leaving discovery procedures to the discretion of the arbitrator is not substantively unconscionable in theory, and would not be so in practice.

    *iv.    Unilateral Right to Amend Arbitration Provision*

Each version of the KeyBank deposit account agreement since Johnson opened the Joint Account has included a change-in-terms provision.  The current version reads in relevant part:

> We reserve the right to change or add to the terms and conditions of this Agreement or change the terms of your Account at any time.  We will give you such notice of the change as we determine is appropriate, such as by

44

statement message or enclosure, letter, or as posted in the branch, and as required under applicable law.

Johnson argues that, as applied to the 2009 Arbitration Provision, KeyBank's ability to unilaterally change the terms of agreement is so "lopsided" as to be substantively unconscionable. The district court did not address this issue. We consider the change-in-terms provision only as it applies to the 2009 Arbitration Provision itself. *See Buckeye*, 546 U.S. at 446 ("Unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

Washington courts have not directly confronted an unconscionability challenge to a provision like this one.[17] We are, however, guided by a recent opinion of the Southern District of California, which applied Washington law to uphold a much less symmetrical provision than the one at hand. In *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051 (S.D. Cal. 2015), *appeal pending*, No. 15-56799 (9th Cir. Nov. 23, 2015), the court considered a unilateral change-in-terms provision found in Amazon.com's "conditions of use," to which customers of the

---

[17] KeyBank cited some Washington case law in defense of the change-in-terms provision, but its cases spoke only to the illusoriness of the provision. The question whether a contractual provision is substantively unconscionable is distinct from the question whether it is illusory, even if their analyses overlap. KeyBank did not cite any case law directly addressing the unconscionability of change-in-terms provisions.

45

site must consent before making an online purchase.  *Id*. at 1057–58.  The provision stated simply that Amazon "reserve[s] the right to make changes to . . . these Conditions of Use at any time."  *Id*. at 1058.

Applying Washington law, the court concluded that the provision was neither "unfairly one-sided" nor "overly harsh"—and therefore not substantively unconscionable under Washington law—for two reasons.  *Fagerstrom*, 141 F. Supp. 2d at 1071.  First, "the performance obligations for both parties, including the core obligation to arbitrate disputes, [were] fixed" and could not be significantly modified at Amazon's whim, notwithstanding the language of the change-in-terms provision.  *Id.* at 1071.  Second, Amazon remained bound by the implied duty of good faith and fair dealing, which required Amazon to "exercise its discretion in a manner consistent with the justified expectations of the parties."  *Id*.

We find the court's reasoning in *Fagerstrom* persuasive and equally applicable to this case.  That is, applying the phraseology used in Washington caselaw, we find the provision neither "one-sided," "shocking to the conscience," "overly harsh," "monstrously harsh," or "exceedingly calloused."  *See Gandee*, 293 P.3d at 1199–200.  Here, as in *Fagerstrom*, KeyBank's commitment to arbitrate is fixed and cannot be eliminated at KeyBank's whim.  Furthermore, its right to unilaterally amend the terms of arbitration is limited by both the

46

requirement to provide "appropriate" notice and the implied duty of good faith and fair dealing. *See Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014). To be sure, KeyBank's change-in-terms provision is asymmetrical by design. But asymmetry alone does not amount to substantive unconscionability under Washington law. *See Satomi Owners Ass'n v. Satomi, LLC*, 225 P.3d 213, 232 (Wash. 2009) (declining to find substantively unconscionable a forum-selection clause that gave drafting party the sole option to require arbitration, despite the absence of mutuality). In short, neither this Court nor a court of Washington would be justified in finding the change-in-terms provision here unconscionable.

### *v.    Confidentiality*

Johnson further challenges a confidentiality clause contained in the 2009 Arbitration Provision, which requires both parties to "keep confidential any decision of an arbitrator." Johnson argues that this provision "disproportionately favors KeyBank as a repeat participant in the arbitration process." The district court agreed, emphasizing the risk that KeyBank's "one-sided access to information" from prior arbitrations might "discourage a plaintiff from bringing a suit."

47

We agree that under Washington law, KeyBank's confidentiality clause would likely be considered substantively unconscionable under the reasoning of *Zuver v. Airtouch Communications, Inc.*, 103 P.3d 753 (Wash. 2004).  In that case, the Washington Supreme Court invalidated a confidentiality clause covering "[a]ll arbitration proceedings" between an employer and its employees.  *Id*. at 765, 765 n.9.  We acknowledge that *Zuver* is not perfectly analogous to the case at hand.  First, *Zuver* dealt with arbitration of an employment discrimination claim, rather than a consumer dispute in the commercial context.  Second, the clause at issue in *Zuver* purported to shroud the entire arbitral process in secrecy.  By contrast, KeyBank's clause prohibits disclosure only of ultimate decisions by an arbitrator. KeyBank's clause "does not prevent consumers from sharing discovery, fact patterns, or briefing from other similar arbitrations."  Thus, the provision at issue in *Zuver* ensured far more secrecy than the provision here.

The court's reasoning in *Zuver* does, however, highlight a core public-policy concern that applies with equal force to this case.  The court explained:

> The effect of the provision here benefits only [the employer].  As written, the provision hampers an employee's ability . . . to take advantage of findings in past arbitrations.  Moreover, keeping past findings secret undermines an employee's confidence in the fairness and honesty of the arbitration process and thus, potentially discourages that employee from pursuing a valid [ ] claim.

48

*Id*. at 765.  In rejecting the broad confidentiality clause at issue in *Zuver*, the court focused its concern on the consequences of secretive outcomes:  That is, without the guidance of prior arbitral decisions, future claimants are less able to assess the viability of their claims.  In turn, they cannot accurately measure the costs of dispute resolution against its benefits.

Thus, following what we perceive to be the approach under Washington law, the non-disclosure provision here is a problem.  To be sure, the arbitration agreement provides access to non-decisional information concerning the arbitral process of previous arbitrations, such as discovery and briefing; and this information can minimize duplicative efforts and could shed light on patterns of misconduct against consumers.  *Cf. McKee*, 191 P.3d at 858 ("Secrecy conceals [ ] patterns of illegal or abusive practices" and "hampers plaintiffs in learning about potentially meritorious claims.").  But where the outcomes of prior arbitration proceedings themselves remain concealed, as the arbitration agreement requires, prospective claimants have little context in which to assess the value of discovered documents or work product from prior disputes.  Consumers may be relieved from "reinventing the wheel" when it comes to collecting evidence and crafting arguments, *see id*. at 858 (observing that, when all elements of the arbitration process are confidential, consumers are forced to "reinvent the wheel in each and

49

every claim"), but they cannot avoid repeating past claimants' mistakes—nor can they leverage prior successes—if they have no insight into dispute outcomes. And whether this would be unconscionable under other states' laws, *Zuver* suggests that the confidentiality provision here would not be countenanced by Washington law.

The obvious informational advantage KeyBank holds at the outset of a dispute may therefore have the effect of discouraging consumers from pursuing valid claims. We thus conclude that under Washington law, the confidentiality clause here is substantively unconscionable. *See Zuver*, 103 P.3d at 765. Nonetheless, under Washington law, "[s]everance is the usual remedy for substantively unconscionable terms." *Woodward*, 368 P.3d at 496 (citing *Gandee*, 293 P.3d at 1201–02). Where unconscionable terms "pervade an arbitration agreement" such that severance would "significantly alter" the tone and nature of arbitration, the court should "declare[] the entire agreement void." *Id.* Washington courts also give weight to severance clauses contained in arbitration agreements. *See Zuver*, 103 P.3d at 768. The 2009 Arbitration Provision contains such a clause.[18]

---

[18] The operable severance clause states: "If any portion of this Arbitration Provision is deemed invalid or unenforceable under any law or statute consistent with the FAA, it shall not invalidate the remaining portions of this Arbitration Provision or the Agreement."

The confidentiality clause in this case is limited in its scope:  it purports only to shield arbitrators' decisions from disclosure, while other information concerning the arbitral process may be disclosed.  Severing this clause will not "significantly alter" the tone or nature of arbitration between Johnson and KeyBank.  *Cf., e.g.*, *id.* (concluding that broad confidentiality clause was "easily excise[d]" from the remainder of the agreement to arbitrate, especially since agreement contained severance clause).  As such, we sever the confidentiality clause contained in the 2009 Arbitration Provision and enforce the remainder of the Provision in accordance with this opinion.

## C.    Lack of Mutuality

Johnson finally argues that the change-in-terms provision renders the 2009 Arbitration Provision illusory and therefore unenforceable.[19]  We consider Johnson's contention under both Washington and Ohio law and find his argument unpersuasive under either.  As before, we consider the change-in-terms provision

---

[19]  Recall that the change-in-terms provision states:

> We reserve the right to change or add to the terms and conditions of this Agreement or change the terms of your Account at any time.  We will give you such notice of the change as we determine is appropriate, such as by statement message or enclosure, letter, or as posted in the branch, and as required under applicable law.

51

only as it applies to the 2009 Arbitration Provision itself. *See Buckeye*, 546 U.S. at 446 ("Unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

Under both Washington and Ohio law, illusoriness arises when there is a lack of mutuality. Washington courts apply two principles to assess whether contractual obligations are truly mutual. First, under Washington law, "a contract is illusory only if it lacks all consideration and mutuality of obligation, e.g., the promisor has no obligations with regard to *any* parts of the contract." *Ekin v. Amazon Servs., LLC*, 84 F. Supp. 3d 1172, 1176 (W.D. Wash. 2014) (citing *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 743–44 (Wash. 2005)). Where the parties' performance obligations remain fixed and only the manner or quality of performance is discretionary, the contract is not illusory. *See, e.g.*, *Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co.*, 145 P.3d 1253, 1258 (Wash. Ct. App. 2006) (declining to find contract illusory even though consumer only committed to paying a "fair" price because "both parties clearly intended the [ ] agreement to be binding").

Second, Washington courts rely on the implied duty of good faith and fair dealing to ensure mutuality of obligations where performance is discretionary. *See Rekhter*, 323 P.3d at 1041 ("Under Washington law, there is in every contract an

52

implied duty of good faith and fair dealing that obligates the parties to cooperate with each other so that each may obtain the full benefit of performance.") (internal quotation marks and alterations accepted).

Ohio law applies the same two principles in the same manner. *See Domestic Linen Supply & Laundry Co. v. Kenwood Dealer Grp., Inc.*, 672 N.E.2d 184, 186 (Ohio Ct. App. 1996) (In Ohio, "[a] contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance.") (internal quotation marks omitted); *Illinois Controls, Inc. v. Langham*, 639 N.E.2d 771, 778 (Ohio 1994) (implying duty of good faith and reasonable efforts to conclude that discretionary promise to perform was "neither illusory nor indefinite").

Johnson argues that KeyBank holds "unfettered," "unlimited," and "absolute" control over the 2009 Arbitration Provision and can "revise or undo" the Provision "at its whim." This is not an accurate characterization of the change-in-terms provision, which specifically obligates KeyBank to provide consumers with notice prior to making any amendment. Moreover, this notice must be "appropriate" in KeyBank's estimation. In Washington and Ohio, this commitment to provide notice is accompanied by an implied duty of good faith and fair dealing, which would guide any court's assessment of whether the notice

53

provided by KeyBank was truly "appropriate."  KeyBank is thus bound by a commitment not just to provide prior notice of a change, but to ensure that this notice is executed in good faith and in fairness to the affected consumers. KeyBank's power to amend the Provision is therefore not unfettered, unlimited, or absolute.

Further, the change-in-terms provision does not empower KeyBank to "rescind the [Provision] at any time," as Johnson suggests.  It explicitly permits only changes or additions to the 2009 Agreement.  The agreement to arbitrate is fixed and is a core component of the 2009 Agreement; only the terms defining the nature of arbitral proceedings are subject to alteration.  *Cf., e.g.*, *Fagerstrom*, 141 F. Supp. 3d at 1065 (declining to presume that a broad, boilerplate change-in-terms provision could be used to "nullify a core obligation" of the contract).  KeyBank is not empowered to simply evade the commitment to arbitrate at its whim.

Because the commitment to arbitrate is fixed and KeyBank is bound by the duty of good faith and fair dealing in making alterations and providing appropriate notice, the change-in-terms provision does not render the 2009 Arbitration Provision illusory under Washington or Ohio law.

## CONCLUSION

54

For the above reasons, we **REVERSE** the district court's order to the extent

described in this opinion and **REMAND** the case to the district court with

instructions to compel arbitration.