[Cite as *Guardian Alarm Co. v. Portentoso*, 196 Ohio App.3d 313, 2011-Ohio-5443.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

GUARDIAN ALARM COMPANY,

      APPELLEE,                              CASE NO.  13-10-54

      v.

PORTENTOSO,                            O P I N I O N

      APPELLANT.

Appeal from Fostoria Municipal Court

Trial Court No. CVF-09-014

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision:   October 24, 2011

APPEARANCES:

    Alvin I. Gilmore, for appellee.

    Charles R. Hall Jr., for appellant.

WILLAMOWSKI, Judge.

{¶ 1} Defendant-appellant, Nicholas Portentoso, appeals the judgment of the Fostoria Municipal Court ordering him to pay $15,000 to his former employer, plaintiff-appellee, Guardian Alarm Company ("Guardian"), pursuant to the terms of an employment agreement requiring the repayment of excess draws against commissions. On appeal, Portentoso contends that the trial court erred in finding that an enforceable contract existed, that the judgment was against the manifest weight of the evidence, and that the trial court erred in denying his Civ.R. 41(B)(2) motion to dismiss. For the reasons set forth below, the judgment is affirmed in part and reversed in part.

{¶ 2} On January 26, 2004, Guardian hired Portentoso for a sales position as a "security consultant" to sell commercial security systems, including fire and burglar alarms as well as various access-control monitoring systems. Portentoso worked for Guardian for more than a year and did his work properly, according to Guardian's testimony. However, in March 2005, Portentoso was indicted on felony charges unrelated to his employment. Because of the sensitive nature of Guardian's security business, the company has a strict policy against employing anyone with a felony record. Guardian terminated Portentoso, an "at-will" employee, in March 2005.

{¶ 3} When Guardian first hired Portentoso, it paid him a guaranteed weekly salary of $700 during a three-month (14 weeks) training period. Beginning May 1, 2004, his compensation was to be based upon commissions plus

potential bonuses. Guardian continued to pay him $700 weekly. After his termination, Guardian claimed that Portentoso owed Guardian $17,445.47 in excess payments of draws against commissions. Guardian maintained that Portentoso signed an employment agreement stating that employees were responsible for the repayment of any draw overpayments. The company attempted to collect the amount owed.[1]

{¶ 4} In January 2009, Guardian filed suit against Portentoso to collect the alleged overpayments. Portentoso filed an answer denying that he owed Guardian any money. He also filed a counterclaim asserting that Guardian owed him additional money for commissions earned and business generated. Guardian moved for summary judgment on Portentoso's counterclaim, and the motion was granted by the trial court.[2] On September 15, 2010, a bench trial was held on Guardian's claims against Portentoso.

{¶ 5} Kristine Zielinski, a regional general manager for Guardian, testified on behalf of Guardian. She testified that Portentoso signed a standard sales-employment packet (the "employment agreement," admitted into evidence as Plaintiff's Exhibit A), which contained the terms of all sales consultants'

---

[1] There was no information in the record as to when Guardian first demanded repayment from Portentoso. Guardian's regional general manager testified that she had turned the information over to the company's corporate attorney in the latter part of 2005 and it was up to him to decide whether to pursue the matter. During the September 2010 trial, Guardian's attorney asked Portentoso whether he had received a demand for repayment "two or three years ago" from an attorney. Portentoso answered that he had not seen a demand until he received a letter from his attorney, but he did not specify when that was.

[2] Portentoso stated that he no longer had the records to prove the amounts he claimed Guardian owed him. He claimed he was hoping to obtain those records from Guardian through discovery. The record did not contain any actual sales or commission records other than the summary worksheet compiled by Guardian's regional sales manager and admitted as Exhibit A-1.

employment with Guardian. According to this employment agreement, the company established draw accounts for employees with payments made against future commissions. The terms of the "Draw Accounts" section stated:

> In the event that an employee's draw account has a deficit balance at the time of the employee's termination with Guardian, the employee agrees to allow Guardian to deduct any such deficit from said employee's final payroll settlement. Furthermore, the employee agrees to re-pay Guardian any remaining deficit within 30 days of termination of said employee's employments.

{¶ 6} Zielinski testified that after Portentoso was terminated, she took information from payroll and monthly reports to put together a commission log worksheet. This worksheet, which Zielinski created as part of an interoffice memo dated September 14, 2005, showed that Portentoso had accrued a shortage against his draw every month that he worked for Guardian after he completed his training period, beginning in May 2004 through March 2005. The worksheet, admitted as Plaintiff's Exhibit A-1, listed the amounts Portentoso received for his draw each month (either $2,800 or $3,500), and listed the monthly amounts that were credited for his commissions earned and bonuses. The worksheet showed that Portentoso had accrued a deficit against his draws of $14,973.32 for the eight months (following his training period) he worked in 2004; $17,790.20 at the time of his termination in March 2005; and a final total deficit of $17,445.47 by July 2005, after subtracting the commissions that were credited after his termination.

{¶ 7} On cross-examination, Zielinski admitted that she had not personally negotiated or discussed Portentoso's terms of employment with him nor had she

actually seen him sign the employment agreement. Both Zielinski and Portentoso testified that Michael McMullin was Portentoso's sales manager; McMullin made the decision to hire Portentoso, and McMullin was the person who was primarily responsible for managing Portentoso and communicating company business to him.[3] Zielinski testified that the company had the original signature page signed by Portentoso in its files, but she did not have personal knowledge that the first six pages of the employment agreement submitted as Exhibit A was the same contract shown to Portentoso. However, Zielinski testified that it was typical procedure for a sales manager to give a new employee the entire employment agreement and then send her only the final signature page, page 7, to keep in the company's files. She testified that she assumed that the employment agreement that she attached to Portentoso's signature page was the same as the one that was a part of the agreement he signed because every employee in that position was given the same agreement.

{¶ 8} Zielinski also acknowledged that although Portentoso was hired in January 2004, the signature page was not signed and dated until nearly 11 months later, in *December* 2004. The signature page is signed by Portentoso in the "employee" column, and it is signed or initialed by Zielinski (as general manager), the director of human resources, the director of finance, and the company president on the "Guardian" side of the page. All of the signatures are dated "12/13/04" or "12/13." Furthermore, the heading on the first page of the

---

[3] McMullin did not testify.

employment agreement states that the effective date is "01/01/05." Zielinski conceded that Portentoso had worked for almost a year before he ever signed this employment agreement, stating, "This was a change in his previous contract that was effective January 1 of '05. He would have had a different contract prior to that." Zielinski testified, "[T]here probably is a contract that he signed in January of '04 that I might have with me. I don't recall. * * * I'd have to look." No agreement that was effective prior to January 1, 2005, was ever produced or admitted. However, Zielinski did testify that "to the best of her knowledge" there was not any significant divergence from any previous agreements "that might have been entered into."

{¶ 9} Zielinski also confirmed that the paragraph pertaining to the repayment of deficit balances in draw accounts upon termination was only one part of Guardian's policies concerning draws against commissions. The employment agreement contained several other sections pertaining to the company's policy concerning draw accounts, stating that the draw should not exceed the average of the prior months' earnings, the draw amount should be at a level so that there was a minimum of two weeks of that amount available in the unpaid commission account, the amount of the draw would be reduced if the balance in the account was less than one week of the employee's draw amount, the draw account was to be reviewed monthly by the manager and adjusted accordingly, and, if a situation occurred where the employee was no longer eligible for a draw and the company was owed advanced commissions, a formula

was provided on how to make up the deficit by applying certain percentages of commission earnings to the deficit. Zielinski admitted that Guardian had not followed any of these other draw policies, but it now wanted to follow the policy requiring repayment.

{¶ 10} Portentoso testified on his own behalf and claimed that he did not owe Guardian any money and that he had never seen the employment agreement submitted as Exhibit A. Portentoso acknowledged that he had signed the signature page on December 13, 2005, but claimed that the signature page was attached to a commission schedule when it was given to him and not the document submitted by Guardian as the employment agreement. Portentoso testified that when he signed the signature page, he also initialed and dated every page of the commission schedule that was attached to it. He knew that Exhibit A was not the agreement he had signed, because his initials were not on it. Portentoso testified that he was certain he had done this, stating, "[I] would not just sign a blank signature page to where anything could be attached to it—I was very specific." He also emphatically denied that he had signed any other employment contract when he first started with Guardian in January 2004. He testified that at that time, he was just given a commission schedule and the only document he signed was an "Employee Payroll Changes" form ("payroll form").

{¶ 11} Portentoso submitted his gold carbon copy of the payroll form as Defendant's Exhibit 1. This payroll form was signed and dated "1/20/2004" by Portentoso and McMullin. The payroll form stated that the purpose of the form

was that he was being hired and the payroll-information section directed that he be paid a $700 weekly guarantee from January 26, 2004, until April 30, 2004. After that time, he was to receive "100% commission." The payroll form also had a box to be checked and initialed by the employee that stated that "Employee understands and agrees that he/she is responsible for repayment of any draw account and/or return of all company owned property or the value thereof." This box was left blank and was not checked or initialed.

{¶ 12} Portentoso testified that he did not initial this box, because he did not want to receive a draw and that his agreement with McMullin was that he was to be paid only straight commission. Portentoso acknowledged that he continued to be paid the $700 weekly amount rather than a variable "straight commission" paycheck. Portentoso testified that when he approached McMullin about this, he was told that the $700 weekly payments were "well within my commission" and not to worry about it. He claims that he was told that at the end of the year, or when he left the company, he would have some money coming back. Portentoso further testified that several months after he was terminated, Guardian sent him a final check for approximately $140. He believed that this was the final settlement for the excess funds in his commission account that Guardian owed him. Portentoso's W-2 for 2005 supports the fact that he received this payment, showing his total year's income to be $7,557.66, which is $137.66 more than the amount Zielinski calculated that Portentoso had received as draw/compensation on the worksheet she compiled.

-8-

**{¶ 13}** When asked if he ever saw a breakdown of the commissions received or an accounting as to where he stood against his draw, Portentoso testified that he had never received any reports but that they had had monthly meetings at which the sales manager would let everyone know where they stood. He further testified that he did keep track of it and he checked several times: "I always knew that I was in the positive or real close to positive."

**{¶ 14}** Based upon the testimony of the witnesses and the exhibits admitted into evidence, the trial court found that Portentoso entered into an employment contract wherein Guardian agreed to pay Portentoso a commission based upon his sales performance and a draw against future commissions. The trial court found that Portentoso was required to pay back the amount received in excess draws and that he owed Guardian $17,445.47. However, because this amount was in excess of the municipal court's statutory monetary jurisdiction, the trial court awarded Guardian the sum of $15,000, plus 4 percent interest.[4] See R.C. 1901.17. It is from this judgment that Portentoso now appeals, raising the following three assignments of error for our review.

First Assignment of Error

> The trial court erred by finding an enforceable contract existed between the parties.

---

[4]Guardian originally filed its complaint in January 2009, stating that Portentoso owed it $14,973.32. In April 2009, Guardian filed a motion for leave to file an amended complaint to increase the amount to $17,445.47. This was denied because the amount exceeded the monetary limit of the municipal court's jurisdiction, and Guardian was informed that it could continue with the original complaint or dismiss and refile in another court. Guardian then filed an amended complaint, increasing its prayer for judgment to $14,999.

Second Assignment of Error

The trial court's judgment was against the manifest weight of the evidence.

Third Assignment of Error

The trial court erred in denying [Portentoso's] Motion to Dismiss pursuant to Ohio Rule of Civil Procedure 41(B)(2).

{¶ 15} Because the first two assignments of error are closely related and pertain to the same testimony and exhibits, we will address them together. Portentoso contends that the trial court erred when it found that an enforceable contract existed between the parties and argues that the court's decision was against the manifest weight of the evidence.

{¶ 16} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *State v. Wilson*, 113 Ohio St.3d 382, 865 N.E.2d 1264, 2007-Ohio-2202, ¶ 24, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at the syllabus. When reviewing a civil judgment under a manifest-weight-of-the-evidence standard, a court should presume that the findings of the trier of fact are correct. *Wilson* at ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 461 N.E.2d 1273. This presumption arises because the trial judge had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id.; *Seasons Coal* at 80.

{¶ 17} The burden of establishing a contract and the terms therein rests upon the party who asserts the agreement. *Lynd v. Sandy & Beaver Val. Farmers Mut. Ins. Co.* (1957), 103 Ohio App. 408, 145 N.E.2d 453. Although the interpretation of the terms of a contract is undertaken as a matter of law and subject to a de novo review, the existence of a contract is a question for the trier of fact. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684; *Gruenspan v. Seitz* (1997), 124 Ohio App.3d 197, 211, 705 N.E.2d 1255.

{¶ 18} Therefore, it was Guardian's burden to establish by a preponderance of the evidence that Portentoso had agreed to work under the terms of Guardian's employment agreement and had agreed to repay any deficits in his draw account upon his termination from employment. Guardian also had the responsibility to prove how much money it was owed.

{¶ 19} Portentoso and Zielinski gave differing and contradictory testimony as to whether Portentoso had signed and agreed to the terms of the employment agreement that Guardian submitted as Exhibit A. Although the agreement attached to Portentoso's signature page in this exhibit was not physically the actual document that constituted the employment agreement, the trial court apparently found Zielinski's testimony credible when she testified that all sales consultants were given this same contract, that the sales manager would have been given a copy of this particular agreement, that this was the contract that would have been

offered to Portentoso, and that it was typical for only the signature page to be sent to the company for filing after it was signed.

{¶ 20} Therefore, giving due deference to the trier of fact and finding that there was some competent and credible evidence to support the trial court's findings as to the employment agreement submitted as Exhibit A, we affirm the trial court's decision as it pertains to the terms of Portentoso's employment with Guardian under that employment agreement. However, by its own stated terms, the Exhibit A employment agreement was only effective beginning January 1, 2005. We do not find that the record contains any competent and credible evidence that Guardian met its burden to prove that there was an agreement in place with these same terms during Portentoso's employment in 2004.

{¶ 21} Guardian did not present any contracts or any signature pages covering Portentoso's employment in 2004. Although Zielinski stated that she "assumed" that Portentoso would have signed a similar agreement covering 2004, her testimony was based on speculation and conjecture. In addition to the lack of any tangible documentary evidence, Zielinski had no definitive personal knowledge that he had signed an employment agreement in 2004. Her testimony indicating that the 2005 agreement "probably" replaced an earlier version did not meet Guardian's burden of proof. Zielinski *alluded to* the likelihood that previous versions would have been similar to the 2005 employment agreement, but she was not able to positively testify to that as a fact.

**{¶ 22}** Further contradicting her testimony that Guardian operated under an identical or even a similar agreement in 2004 was the fact that the company's payments to Portentoso in 2004 did not in any way comply with the stated terms of the submitted Exhibit A employment agreement. The employment agreement specified that the amount of the draw would be adjusted and reduced if an employee's commission did not equal or exceed the money available in the draw account. In 2004, Portentoso's draw was never reduced when his commissions were less than his draw. Only beginning in 2005, the effective date of Exhibit A, did Guardian reduce Portentoso's draw payments from $2,800 in January, to $2,520 in February, and then to $2,100 in March. During 2004, *when his monthly shortages against his draw averaged almost $1,900*, he was consistently paid his full $700 each and every week.

**{¶ 23}** Furthermore, Guardian also paid Portentoso a bonus almost every month during 2004, including a bonus of over $1,161 for December, when he had allegedly accrued a deficit against his draw of almost $15,000. That, coupled with Portentoso's copy of his 2004 payroll form in which the box requiring the repayment of any excess draw payments was not checked and initialed, is further documentary evidence challenging the credibility of Guardian's assertion that there was an agreement in place requiring Portentoso to repay any funds for 2004.

**{¶ 24}** Guardian did not present any definitive evidence of the existence of an employment agreement covering 2004, nor did it present any evidence that Portentoso had signed any such agreement in 2004. Because there was no

competent and credible evidence in the record to establish that Portentoso was working under any kind of employment agreement in 2004 that specified that he was required to repay deficits in his draw account, we find that Portentoso does not owe Guardian for any alleged deficit in his draw account for that year.

{¶ 25} The record contains competent and credible evidence that if believed by the trier of fact would support the finding that Portentoso was required to repay the amount of draw he received during 2005 that exceeded the amount of commission earned. Therefore, the first and second assignments of error are overruled as they pertain to Portentoso's employment with Guardian in 2005. However, Portentoso's first and second assignments of error are sustained as they pertain to his employment with Guardian in 2004.

{¶ 26} Based upon our findings above, it is not necessary to address Portentoso's third assignment of error in detail. Civ.R. 41(B)(2) provides that in an action tried by the court without a jury, at the conclusion of the plaintiff's case-in-chief, the defendant may move for dismissal "on the ground that upon the facts and the law the plaintiff has shown no right to relief." Civ.R. 41(B)(2). The trial court must then render judgment against the plaintiff or it may decline to render any judgment until the close of all the evidence. Id. As stated above, there was sufficient evidence before the court to rule in favor of Guardian pertaining to Portentoso's employment in 2005, but not in 2004. The trial court should have granted Portentoso's Civ.R. 41(B)(2) motion to dismiss as it pertained to his 2004 employment.

**{¶ 27}** Having found some error prejudicial to the appellant herein in the particulars assigned and argued, we reverse the judgment of the trial court as it pertains to the repayment of any money relating to appellant's employment with appellee prior to January 1, 2005, we affirm the decision of the trial court as it pertains to the repayment of any money owed as a result of appellant's employment with appellee during 2005, and we remand for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

ROGERS, P.J., and PRESTON, J., concur.