WELBAUM, P.J.
{¶ 1} In this case, Defendants-Appellants, Brenda Coverstone and Hard Times Farm, LLC, appeal from a declaratory judgment, which concluded that Plaintiffs-Appellees, Diana Wilhelm and Carol Meyer, are each entitled to a one-eighth interest as tenants in common in a parcel of property of approximately 166 acres (the Kennedy farm).[1] Hard Times Farm owns the remaining interest in the Kennedy farm.
*974 {¶ 2} In support of the appeal, Brenda contends that the trial court erred when it determined that Diana and Carol each held a one-eighth fee simple interest in the disputed real estate. Brenda further contends that the court erred in finding that Anita Kennedy (the mother of Brenda, Diana, and Carol) did not consume the remainder interests in the disputed real estate pursuant to a care contract with Brenda, and that the care Brenda provided was gratuitous.
{¶ 3} We conclude that the trial court did not err in concluding that Diana and Carol each owned a one-eighth interest as tenants in common with Hard Times Farm. The trial court correctly rejected an alleged contract that Brenda claimed to have entered into for the care of the parties' elderly mother. Specifically, the court found that Brenda's testimony about the alleged contract was not credible. The court's conclusion was supported by the evidence. In addition, the trial court did not err in concluding that Anita, who held a life interest in the disputed property, did not consume the remainder interests in the property. Accordingly, the judgment of the trial court will be affirmed.
I. Facts and Course of Proceedings
{¶ 4} This case arises from a family dispute over ownership of the Kennedy farm. Forrest and Anita Kennedy were married and owned the Kennedy farm as tenants in common, rather than as joint owners. The farm property had been in the Kennedy family for many generations.
{¶ 5} Forrest and Anita had four daughters: Diana, Carol, Brenda, and Linda Newman ("Linda").[2] In June 2008, Forrest executed a will granting Anita a life estate in his half of the Kennedy farm. Upon Anita's death, each daughter was to receive a one-fourth interest in Forrest's share of the property. At the time, Anita had a similar will. Consequently, after both Forrest and Anita died, each daughter would inherit a one-fourth interest in the Kennedy farm.
{¶ 6} Forrest died in February 2010, when he was 78 years old. Due to health issues, Forrest had stopped farming the land himself in 1992, and sold his farm equipment a few years later. From 1995 to around 2014, the Sutherly Brothers farmed the property "on the halves," which meant that each side paid for half of the seed, chemical, and fertilizer costs, and the Sutherly Brothers provided labor, equipment, combining, trucking, and so forth. The net proceeds from the sale of crops would then be divided equally. According to the evidence, this resulted in an income for Forrest and Anita of $45,000 to $60,000 per year. In addition, until around 2005, Forrest earned income from owning and driving trucks.
{¶ 7} In 2007, Anita developed a skin disease that caused significant problems. She was about 76 years old. From that time on, Anita was either constantly hospitalized or resided in a nursing home. Anita was in a nursing home at the time of Forrest's death. Forrest also resided in the same nursing home for a few months before his death, due to his own health problems.
{¶ 8} In early August 2010, or about six months after Forrest's death, Brenda told her sisters that she was going to take care of Anita. Brenda then took Anita into her home and cared for her. Brenda voluntarily chose to do this. However, according to Brenda, Anita signed an agreement on August 2, 2010, agreeing to pay Brenda $18.00 per hour, on a twenty-four hour/seven day a week schedule, until Anita died. At that rate ($432 per day), Brenda would *975 have been entitled to $157,680 per year for caring for her mother ($432 times 365 days per year). In the three and a half years prior to Anita's death, the cost of the care, therefore, would have been about $544,320.
{¶ 9} Brenda claimed that Anita also agreed to pay her "extra" fees in addition to the $18.00 per hour charge. These extra fees were imposed for twenty-five items, which included matters like giving Anita baths or showers, doing laundry at $7.00 per load, giving Anita medication, mileage for picking up items for Anita at the grocery store, cooking, doing dishes, and doing housework. In addition, Anita allegedly agreed to pay for a percentage of Brenda's household expenses like utilities, phone, electric, house fuel, gas, and food. During the time that Anita lived with Brenda and two of Brenda's children, Anita's income supported the household; Brenda testified that she earned some income from dog-breeding and harvesting hay, but she was, as the trial court noted, very evasive about her income. Diana and Carol were unaware of the alleged agreement between Anita and Brenda. They were also never paid for any care they gave their mother.
{¶ 10} Anita lived with Brenda from August 2, 2010, until Anita died on January 14, 2014. While Anita lived with Brenda, Anita's other daughters visited on a regular basis. On November 1, 2011, Anita executed a new will, leaving all of her personal and real property (including her own one-half interest in the Kennedy farm) to Brenda. Diana, Carol, and Linda were disinherited, unless Brenda pre-deceased Anita. In that event, Anita gave a one-fourth share of the property to Brenda's children, and one-fourth each to Diana, Carol, and Linda.
{¶ 11} Brenda was the executor of Forrest's estate, which was admitted to probate on March 2, 2010. As executor, Brenda was aware of the assets and liabilities of Forrest's estate. A schedule of assets that was filed on June 21, 2010, valued Forrest's share of the pertinent real property at $166,610.[3]
{¶ 12} For reasons that are not apparent in the record, Forrest's estate was not closed until 2013. On June 25, 2013, Brenda filed an application for a certificate of transfer as part of her role as the executor of Forrest's estate. The Miami County Probate Court granted the application on June 27, 2013, and a certificate of transfer was filed, stating that Anita had a life estate in the property described in the certificate and that Brenda, Diana, Carol, and Linda each possessed a 1/4 ownership interest in the property. The described property was the 166 acres (the Kennedy farm) that are currently in dispute.
{¶ 13} Brenda's personal attorney was Frank Patrizio, who had handled Brenda's divorce. Patrizio also prepared articles of organization for Hard Times Farm, LLC, which were filed with the Ohio Secretary of State on December 11, 2012, Brenda was the sole owner of the company. Subsequently, at Anita's request, Patrizio prepared a quit-claim deed granting the 166 acres in the Kennedy farm to Hard Times Farm. Brenda brought Anita to Patrizio's office, and Anita signed the quit claim deed on June 11, 2013. However, the deed was not recorded until August 12, 2013.
{¶ 14} Anita was hospitalized at Ohio State University Hospital for two or three weeks in the fall of 2013, and then had a stroke in mid-November 2013. After the stoke, Anita was hospitalized essentially from mid-November until she died on January *976 14, 2014, although it appears she may have returned to Brenda's home for a very brief period before her death.
{¶ 15} Diana and Carol learned of the transfer of the 166 acres to Brenda after hearing from people that something was going on. After Diana checked, it appeared that property had been transferred back and forth two or three times to Hard Times Farm. Brenda would not give Diana and Carol any answers. Diana and Carol also asked Brenda to see the books for the Kennedy farm, but Brenda refused to allow them to see the books.
{¶ 16} In April 2014, the attorney for Diana and Carol filed affidavits with the Miami County Recorder, terminating Anita's life estate due to her death on January 14, 2014. At some point after Anita's death, Brenda terminated the relationship with the Sutherly Brothers, but did not inform her sisters. Diana found out that the Sutherly Brothers had been terminated when she saw another farmer's helper in the Kennedy farm fields.
{¶ 17} Jim Sutherly, one of the owners of Sutherly Brothers, and the owner of both Miami Valley Fertilizer & Seed and Miami Valley Feed & Grain, testified that he dealt with and only sent bills to Brenda. Sutherly testified that Brenda owed Miami Valley Fertilizer & Seed about $24,000 for farming the land.
{¶ 18} In August 2014, Brenda filed an insolvency schedule of claims in Anita's estate. The schedule included $24,332.86 owed to Miami Valley Feed & Grain, $50,000 for what Brenda called a "secured claim" owed to her, and various other debts, most of which were for Anita's funeral expenses.
{¶ 19} On March 11, 2015, Diana, Carol, and Linda filed a complaint for damages and declaratory judgment in Miami County Common Pleas Court against Brenda and Hard Times Farm. The complaint contained several causes of action, including a request for declaratory judgment, conversion, unjust enrichment, fraud, and a request to pierce the corporate veil. Brenda and Hard Times Farm then filed an answer and a counterclaim to quiet title.
{¶ 20} The trial court held a bench trial on January 4 and 5, 2017. Following the trial, the court issued a decision and judgment entry finding that Diana and Carol were each owners of a one-eighth interest in the Kennedy farm as tenants in common with Hard Times Farm. The court dismissed Diana and Carol's remaining claims and also found in favor of Diana and Carol on the counterclaim to quiet title. Accordingly, the counterclaim was dismissed as well. This appeal followed.
II. Alleged Error in Deciding Ownership of the Property
{¶ 21} Brenda's First Assignment of Error states that:
The Trial Court Erred When It Determined Plaintiffs/Appellants Held a One-Eighth (1/8th) Fee Simple Interest in the Disputed Real Properties.
{¶ 22} Under this assignment of error, Brenda raises two issues, but then discusses her second issue first. For ease of discussion, we will address the issues in the order they were initially listed in Brenda's brief.
{¶ 23} In the first issue, Brenda's contends that the trial court erred by failing to find that Forrest's final intentions were to care for Anita and that Anita used her power to consume the real properties, which prevented the vesting of the remainder interests. According to Brenda, Diana and Carol did not have a fee simple interest in the Kennedy farm because the vesting of their remainder interest was delayed due to language in Forrest's will that *977 allowed Anita to consume the property. According to Brenda, this power of consumption was subject only to the requirement that consumption be for adequate consideration. In this regard, Brenda's argument is that Anita appropriately used the power to consume when she contracted with Brenda to devote most of Brenda's work time to Anita's care.
{¶ 24} Forrest's will, which was signed in 2008, provided, in pertinent part, that:
Item Two: I give, devise and bequeath, all of the real property that I may own at the time of my death, to my wife, ANITA ERMA KENNEDY, to be hers during the term of her natural life. My said wife shall not be required to account for or repair any waste, injury or damage to or depreciation of such real property, or to replace any part thereof which may be consumed, used up, or destroyed, unless the same is attributable to her act or omission, except as herein otherwise expressly provided.
I authorize my wife, ANITA ERMA KENNEDY, in her absolute discretion to manage said real property in any way that she deems appropriate. My wife is empowered to sell said real property, or any portion therefore at such times, for such price, and upon such terms, including terms of credit as she may deem advisable and reinvest same. My wife shall receive all of the income of the real property.
I direct that my wife, ANITA ERMA KENNEDY, shall not be required to give a bond or other security for the safekeeping of the real property herein described.
Upon the death of my wife, ANITA ERMA KENNEDY, the property devised in this ITEM, shall be devised and bequeathed to my children, BRENDA LEE KENNEDY COVERSTONE, DIANA LYNN WILHELM, CAROL ANN MEYER, AND LINDA KAY NEWMAN * * *.
Plaintiff's Ex. 1, pp. 1-2; Defendant's Ex. U, pp. 1-2.
{¶ 25} After hearing the testimony, the trial court noted that while Anita had the power under the will to consume Forrest's portion of the property, her power was not without limitations. The court further commented that the claim that Anita "consumed" all of Forrest's interest in the farm was based on Anita's alleged agreement to pay Brenda $18 per hour, twenty-four hours per day, for the rest of Anita's life. However, the court gave no weight to this alleged agreement, because its viability rested on the credibility of Brenda, who was not credible as a witness. The court also noted, among other things, the patently unreasonable nature of the alleged agreement, including the fact that Brenda was to be paid while she and Anita were both sleeping, while Brenda was out pursuing activities of her own, and even during Anita's lengthy hospitalizations.
{¶ 26} The court also stressed the lack of any witnesses to the alleged agreement, inconsistencies in Brenda's testimony about the alleged agreement, and Brenda's evasive testimony. The court further observed that even if it were possible that Anita wished to compensate Brenda in some way for her care, Anita's transfer of her own undivided half-interest in the farm in June 2013 had compensated Brenda in the amount of $415,000, based on the stipulated value of the farm.
{¶ 27} Finally, the court noted that although Anita had the ability to consume the real property, there was no credible evidence that the transfer of Forrest's share of the farm to Hard Times Farm was necessary for Anita's support and maintenance. The court, therefore, found that Diana and Carol were each the owners *978 of a one-eighth interest as tenants in common in the Kennedy farm.
{¶ 28} When appellate courts review trial court judgments following bench trials, a presumption applies that the findings of the trial court are correct. Fed. Ins. Co. v. Fredericks , 2015-Ohio-694, 29 N.E.3d 313, ¶ 21 (2d Dist.), citing State ex rel. Petro v. Gold , 166 Ohio App.3d 371, 2006-Ohio-943, 850 N.E.2d 1218, ¶ 81 (10th Dist.). Consequently, appellate courts may not substitute their judgment for that of trial courts, and must affirm judgments that are "supported by some competent, credible evidence going to the essential elements of the case." Gold at ¶ 81, citing Reilley v. Richards , 69 Ohio St.3d 352, 632 N.E.2d 507 (1994), and Koch v. Ohio Dept. of Nat. Resources , 95 Ohio App.3d 193, 642 N.E.2d 27 (10th Dist.1994).
{¶ 29} Appellate courts are also "mindful that in a bench trial, 'the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " Emswiler v. Bodey , 2d Dist. Champaign No. 2012 CA 3, 2012-Ohio-5533, 2012 WL 5989636, ¶ 44, quoting Seasons Coal Co., Inc. v. Cleveland , 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). As a result, where " 'the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.' " Seasons Coal Co. at 80, 461 N.E.2d 1273, fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978). Accord Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21 ; Emswiler at ¶ 44.
{¶ 30} The Supreme Court of Ohio held many years ago that "[t]he law favors the vesting of estates at the earliest possible moment, and a remainder after a life estate vests in the remainderman at the death of the testator, in the absence of a clearly expressed intention to postpone the vesting to some future time." Ohio Nat. Bank of Columbus v. Boone , 139 Ohio St. 361, 40 N.E.2d 149 (1942), paragraph two of the syllabus. Accord Stevens v. Radey , 117 Ohio St.3d 65, 2008-Ohio-291, 881 N.E.2d 855, ¶ 11 ("rights of the beneficiaries become fixed and certain at the death of the testator unless a contrary intent is manifested")
{¶ 31} In the case before us, Anita had the power under the will to consume the property for her support, but, as the trial court correctly observed, Anita's rights were not unlimited. A life beneficiary with the power to consume an estate for her support has a duty, "in the nature of a trust, to have due regard for the rights of those in remainder, as to the part of the estate not consumed by her for her support; that while she could use and enjoy the estate to its fullest extent for her support, and consume the whole of it, if necessary, she could not go beyond what would be regarded as good faith towards the remainder-men." Johnson v. Johnson , 51 Ohio St. 446, 460-461, 38 N.E. 61 (1894).
{¶ 32} In Johnson , the court noted that "[t]he testator, having so amply provided for the support of his wife, evidently contemplated good faith on her part towards his brothers and sisters [the remaindermen]. He therefore gave her the right to consume, but [not] to recklessly squander or give away, the estate. The widow holding this estate, under this will, only for life, and, as to the unconsumed part thereof, in trust for the remainder-men, such trust would be enforced as against one coming into possession of the estate with knowledge of the trust." Id. at 461, 38 N.E. 61.
*979 {¶ 33} According to the court, "[t]he widow, under this will, was, by implication, a quasi trustee for those in remainder, and the interest of the brothers and sisters of the testator in the unconsumed property was a vested right, which could not be destroyed by the act of the widow in disposing of the property by gift to a third party, or otherwise than for her support, or the benefit of the estate." Johnson at 446, 38 N.E. 61, paragraph two of the syllabus.
{¶ 34} During her lifetime, Anita did not sell Forrest's share of the farm and reinvest the proceeds, as was permitted by the will. Instead, she signed a quit-claim deed in June 2013, granting the entire property of Kennedy Farm, including her own undivided interest, to Hard Times Farm. As the trial court noted, the quit claim deed does not recite any consideration that was exchanged for the grant of the property. In view of these facts, the analysis could stop here, because the property was not disposed in the manner the will authorized. Specifically, Anita could have sold the real estate and reinvested the proceeds (which she did not do), or she could have mortgaged the property, for example, if she needed funds for her own support. She chose not to do so, but simply quit-claimed her interest to Hard Times Farm, which was solely owned by Brenda.
{¶ 35} Assuming for the sake of argument that the property could be disposed of in this manner that occurred, Brenda's argument, as noted by the trial court, was that Anita "consumed" Forrest's interest by agreeing to pay Brenda for care. We find no error in the trial court's decision to disregard the alleged agreement.
{¶ 36} " 'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.' " Kostelnik v. Helper , 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16, quoting Perlmuter Printing Co. v. Strome, Inc. , 436 F.Supp. 409, 414 (N.D.Ohio 1976). The party asserting the existence of a contract has the burden of proof. Grdn. Alarm Co. v. Portentoso , 196 Ohio App.3d 313, 2011-Ohio-5443, 963 N.E.2d 225, ¶ 17 (3d Dist.) ; Nilavar v. Osborn , 127 Ohio App.3d 1, 11, 711 N.E.2d 726 (2d Dist.1998) ; Lynd v. Sandy & Beaver Valley Farmers Mut. Ins. Co. , 103 Ohio App. 408, 411, 145 N.E.2d 453 (4th Dist.1957).
{¶ 37} Furthermore, while interpretation of contract terms is a legal issue, "the existence of a contract is a question for the trier of fact." Gruenspan v. Seitz , 124 Ohio App.3d 197, 211, 705 N.E.2d 1255 (8th Dist.1997) ; Portentoso at ¶ 17 ; In re Estate of Ivanchak , 169 Ohio App.3d 140, 2006-Ohio-5175, 862 N.E.2d 151, ¶ 18 (11th Dist.) ; In re Estate of Bowman , 12th Dist. Warren No. CA92-04-037, 1992 WL 389768, *1 (Dec. 28, 1992).
{¶ 38} The facts in the case before us are that one of the parties to the alleged contract was deceased at the time of trial, and there were no witnesses to the signing of the contract. To prove the existence of the contract, Brenda, the other contracting party, offered a document and her testimony as a witness, which the trial court found lacked credibility. The trial court simply did not believe Brenda's testimony that a contract existed. As was noted, we defer to the trial court's credibility decisions.
{¶ 39} Although we do defer to credibility decisions, we have also read the entire record and conclude that it supports the trial court's findings about Brenda's lack of credibility. Brenda's testimony, even as presented via written transcript, was evasive.
*980 Brenda appeared incapable of answering questions directly and, as the trial court noted, when she was asked questions, she gave long, non-responsive replies. For example, when Brenda was questioned on cross-examination, she was unable (or refused) to answer simple questions like whether she had a mortgage associated with her property, or to whom her mother may have owed money. Transcript of Proceedings, Day 1 ("Tr. 1"), p. 40; Transcript of Proceedings, Day 2 ("Tr. 2"), p. 160. Brenda also laughed inappropriately at numerous times during her testimony and had to be instructed several times during the trial to stop pounding on the witness box. She was also instructed not to make noises into the microphone. See Tr. 1 at pp. 22, 25, 29, 34, 36, and 52; Tr. 2 at pp. 96, 107, 111, 135, 139, 141, 149, and 161.
{¶ 40} In Bowman , 12th Dist. Warren No. CA92-04-037, 1992 WL 389768, the trial court rejected a claim against an estate for care rendered to a decedent for eight months before his death, while he lived in the claimant's home. In affirming the trial court and concluding that no contract for care existed, the court of appeals stressed that the claimant never attempted to collect any money during the time she performed the services, that there were no witnesses to the alleged contract, and that neither party ever informed anyone else about the contract. Id. at *1.
{¶ 41} The trial court here made similar observations, noting that "Brenda did not receive any direct, consistent compensation (in the form of money) from her mother for the almost three and a half years that Anita lived with Brenda," and "did not even request to be paid while her mother was living." Doc. # 48, at pp. 5-6. In addition, the court stressed that there were no witnesses to the agreement, and that two pages of the alleged agreement were not initialed or signed, therefore impeaching Brenda's testimony that these pages were part of the agreement. Id. at p. 10. There was also a discrepancy in the time referenced in part of the alleged agreement. The trial court attempted to clarify this with Brenda, but received only confusing and non-responsive answers. See Tr. 2 at pp. 108-109.
{¶ 42} Furthermore, the testimony indicated that Brenda never informed her sisters that she and her mother had made an agreement, even though Diana, in particular, was at Brenda's home several days a week to visit Anita. The trial court also stressed that Brenda demonstrated a lack of credibility with respect to the compensation she was to receive under the alleged agreement.
{¶ 43} In its decision, the trial court further stated that Brenda failed to present evidence indicating that her mother needed to consume Forrest's portion of the land for her support. We agree with this observation. In fact, the evidence contradicts such a notion. Brenda admitted that her mother received $1,200 per month net in Social Security benefits and also received between $45,000 and $60,000 per year in farm income. Tr. 2 at pp. 157-159. Although Brenda testified that her mother paid part of the utilities for Brenda's home, there was no indication of what happened to the rest of this substantial amount of income, other than Brenda's unsubstantiated testimony that her mother's medicines cost between $800 and $1,200 per month. At trial, Brenda did not submit a single document verifying any amount spent or contributed to her household during the time her mother lived with her.
{¶ 44} The trial court commented that Anita was the only person living in Brenda's four-person household who had regular income, and that "Brenda was unable *981 to provide a simple answer as to how she paid her own household expenses during the three and a half years that she was taking care of Anita without any regular compensation of her own." Doc. # 48 at p. 5. The court's observation is supported by the record.
{¶ 45} Based on the preceding discussion, we find no error in the trial court's conclusion that Anita did not consume the remainder interests in the property due to a care agreement between Brenda and Anita. We also note that there was no alleged agreement between Anita and Hard Times Farm, which was the entity to whom Anita conveyed her interest in the Kennedy Farm.
{¶ 46} In the second issue, Brenda contends that the trial court erred in concluding that Diana and Carol each owned a one-eighth interest in the disputed property, in part, because the probate court handling Forrest's estate had issued a certificate of transfer stating that Anita had a life estate and that the surviving daughters each had a one-fourth interest. According to Brenda, the certificate did not transfer the property because it was not recorded, and was also filed after Anita had signed the quit claim deed.
{¶ 47} On June 27, 2013, the probate court filed a judgment entry granting the application for a certificate of transfer of Forrest's interest in the Kennedy Farm. Brenda was well aware of this, because she was the executor of Forrest's estate and had signed the application on June 25, 2013, asking the court to issue a certificate of transfer. See Plaintiff's Ex. 2. The certificate of transfer listed the persons to whom the real property had passed, as follows: Anita had a "life estate," and Brenda, Carol, Diane, and Linda each had a one-fourth share of Forrest's interest. Id.
{¶ 48} Previously, Anita had signed a quit claim deed on June 11, 2013, granting the Kennedy farm to Hard Times Farm. However, the quit claim deed was not recorded until August 12, 2013. Brenda, as executor of Forrest's estate, did not file the certificate of transfer with the country recorder. After Anita's death on January 14, 2014, the attorney representing Diana and Carol filed affidavits with the county recorder, terminating Anita's life estate due to Anita's death.
{¶ 49} After Diana and Carol filed the present action, Brenda filed a counterclaim, noting the quit-claim deed, as well as the affidavits that had been recorded terminating Anita's life estate. Brenda asked the trial court to quiet title to the property and declare Hard Times Farm, LLC, as the fee simple owner. In its decision, the trial court found in favor of Diana and Carol on the counterclaim and dismissed Brenda's counterclaim with prejudice.
{¶ 50} Concerning actions to quiet title, R.C. 5303.01 provides that:
An action may be brought by a person in possession of real property, by himself or tenant, against any person who claims an interest therein adverse to him, for the purpose of determining such adverse interest. Such action may be brought also by a person out of possession, having, or claiming to have, an interest in remainder or reversion in real property, against any person who claims to have an interest therein, adverse to him, for the purpose of determining the interests of the parties therein.
{¶ 51} Actions to quiet title are equitable, and "[t]he rule in equity applies to suits quieting title, that he who seeks equity must do equity and must therefore have clean hands."
*982 Aveyard v. Shelron Ents., Inc., 2d Dist. Montgomery No. 8855, 1985 WL 6675, *3 (Jan. 11, 1985), citing Logan Gas Co. v. Keith , 117 Ohio St. 206, 158 N.E. 184 (1927). "The clean-hands doctrine specifies that 'he who seeks equity must do equity, and that he must come into court with clean hands.' " State ex rel. Morgan v. New Lexington , 112 Ohio St.3d 33, 2006-Ohio-6365, 857 N.E.2d 1208, ¶ 53, quoting Christman v. Christman , 171 Ohio St. 152, 154, 12 O.O.2d 172, 168 N.E.2d 153 (1960).
{¶ 52} "This doctrine requires that the party invoking equity 'not be guilty of reprehensible conduct' regarding the subject matter of the suit.' " State ex rel. DeWine v. Fred's Party Ctr., Inc. , 2014-Ohio-2358, 13 N.E.3d 699, ¶ 63 (7th Dist.), quoting Basil v. Vincello , 50 Ohio St.3d 185, 190, 553 N.E.2d 602 (1990). Moreover, the party asserting the right to a title has the burden of establishing it. Duramax, Inc. v. Geauga Cty. Bd. of Commrs ., 106 Ohio App.3d 795, 799, 667 N.E.2d 420 (11th Dist.1995).
{¶ 53} As a preliminary point, we note that the trial court did not state that Diana and Carol were tenants in common because of the certificate of transfer; the court simply noted in its findings of fact that Anita had signed a quit claim deed that was filed on August 12, 2013, and that a certificate of transfer was issued on June 27, 2013, showing that Anita had a life estate and that the four daughters each had a one-fourth interest in Forrest's share. Doc. # 48 at p. 7. These facts were correct. Rather than relying on the certificate of transfer, the trial court's verdict states that "in accordance with the terms of the will of Forrest McCain Kennedy, Diana Lynn Wilhelm and Carol Meyer are each owners of a 1/8 interest as tenants in common with Defendant Hard Times Farm, LLC in the property described on Exhibit A attached to this Judgment Entry." Id. at p. 12. This was also accurate, since that is what Forrest's will provided.
{¶ 54} As was noted, Anita had the ability under the will to sell the real estate and reinvest the proceeds. Thus, she did not have the right to transfer the property in which her daughters held an interest unless she satisfied these requirements: (1) a sale; and (2) reinvestment of the proceeds from the sale. This did not occur.
{¶ 55} Furthermore, "a quit-claim deed transfers only those rights which a grantor has at the time of the conveyance." Kamenar R.R. Salvage v. Ohio Edison Co. , 79 Ohio App.3d 685, 689, 607 N.E.2d 1108 (3d Dist.1992), citing Jonke v. Rubin , 170 Ohio St. 41, 162 N.E.2d 116 (1959), paragraph one of the syllabus. Accord Johnsonite, Inc. v. Welch , 11th Dist. Geauga No. 2011-G-3012, 2011-Ohio-6858, 2011 WL 6940475, ¶ 57 ; Dueck v. Clifton Club Co. , 2017-Ohio-7161, 95 N.E.3d 1032, ¶ 55 (8th Dist.).
{¶ 56} At the time Anita signed the quit claim deed, she had only a life estate in Forrest's portion of the property and could not otherwise transfer this part of the real estate without selling it and reinvesting the proceeds. Since that did not occur, to the extent that Hard Times Farm received anything under the quit claim deed, it obtained only Anita's life estate and the rights that Anita possessed. For example, Hard Times Farm would be entitled to the income from Forrest's portion of the Kennedy farm until Anita died. The quit claim deed did not affect the interests of the remaindermen, and could not, unless Anita had complied with the requirements in the will that restricted her right to dispose of the real estate.
{¶ 57} Accordingly, whether or not the certificate of transfer was recorded prior to time the quit claim deed was signed or recorded is irrelevant. Brenda has not argued that there was a purchase of the *983 property; instead, she relies on Anita's power to consume. However, that is different from the power to sell the property. As was noted, if Anita needed financial support, she could have taken out a mortgage against the property and used the money for her support.
{¶ 58} To the extent that Brenda might contend that there was a "sale" evidenced by the quit claim deed, there are several problems with this argument. First, as the trial court noted, there was no contract for Brenda to be paid for services. Even if there had been a contract, the property was deeded to Hard Times Farm, which was not the contracting party. Furthermore, even if one considered Brenda, as sole proprietor of Hard Times Farm, to be the "purchaser," Brenda clearly was not a bona fide "purchaser."
{¶ 59} "A 'bona fide purchaser' is one who acquires legal title to real estate for valuable consideration, in good faith, and without knowledge or notice of another's equitable interest in that property." Bergholtz Coal Holding Co. v. Dunning , 11th Dist. No. 2004-L-209, 2006-Ohio-3401, 2006 WL 1816290, ¶ 32, citing Shaker Corlett Land Co. v. Cleveland , 139 Ohio St. 536, 41 N.E.2d 243 (1942), paragraph three of the syllabus. Accord Soley v. Soley , 6th Dist. Huron No. H-13-028, 2014-Ohio-3965, 2014 WL 4514860, ¶ 26.
{¶ 60} "An 'equitable owner' is one who is recognized in equity as the owner of the property, because the real and beneficial use and title belong to him, although the bare legal title is invested in another." Levin v. Carney , 161 Ohio St. 513, 518, 120 N.E.2d 92, 96 (1954). See also Caldwell v. Caldwell , 2d Dist. Clark No. 1201, 1978 WL 216144, *6 (May 31, 1978). Even if Diana's and Carol's interests were considered equitable because the certificate of transfer was not recorded prior to the time the quit claim deed was recorded, Brenda had knowledge of her sisters' interests in the property.
{¶ 61} Furthermore, if any delay occurred in recording the certificate of transfer, it would have been attributable to Brenda, who as the fiduciary of Forrest's entire estate, owed the beneficiaries a duty to "act in a manner which protects the beneficiaries' interests." Elam v. Hyatt Legal Servs. , 44 Ohio St.3d 175, 176, 541 N.E.2d 616 (1989). Failing to record a certificate of transfer prior to recording a quit claim deed that attempts to divest beneficiaries of their interests in an estate is hardly acting to protect their interests.
{¶ 62} Based on the preceding discussion, the First Assignment of Error is overruled.
III. Consumption of Remainders Due to Care Contract
{¶ 63} Brenda's Second Assignment of Error states that:
The Trial Court Erred and Abused Its Discretion When It Found that Anita Erma Kennedy Did Not Consume the Remainder Interests in the Disputed Properties Pursuant to the Care Contract with Brenda Coverstone and That All Care Provided by Ms. Coverstone Was Gratuitous.
{¶ 64} Brenda raises two issues under this assignment of error. The first is that the court erred when it found that Brenda used Anita's income when Anita resided with her. The second issue alleges that the trial court erred when it found that Brenda's testimony lacked credibility in connection with the agreement for personal services.
{¶ 65} With respect to the first contention, we have already discussed these points in resolving the First Assignment of Error. There was ample evidence that Brenda used Anita's income while Anita lived with her, and that Anita had sufficient *984 income for her own support without consuming any further property. According to Brenda, there was only "vague" evidence about farm income, and it was presented by a clearly biased person (Jim Sutherly), who purported to be a creditor of Brenda. See Appellant's Brief, p. 12. To the contrary, Brenda admitted that her mother received $1,200 net per month in Social Security benefits and also received between $45,000 and $60,000 per year in farm income. Tr. 2 at pp. 157-159.
{¶ 66} The trial court noted that a partial accounting filed in Forrest's estate in September 2011 showed a distribution of almost $18,000 to Anita. This was after payment of all claims against Forrest's estate. See Plaintiff's Ex. 5. In the three and a half years that Anita lived with Brenda, Anita received additional farm and social security income. Despite this, Brenda filed an "insolvency schedule of claims" in the probate action for Anita's estate. The schedule, which was filed on August 28, 2014, indicated that Anita's estate was insolvent. See Plaintiff's Ex. 9 and R.C. 2117.15. Obviously, Anita's money was spent somewhere, even though Anita did not go anywhere by herself while she lived with Brenda and was generally housebound. However, when Brenda was asked at trial about anyone to whom her mother owed money, Brenda said "I don't have that in front of me." Tr. 2 at p. 160. Brenda then indicated that as the "record keeper," she did not have "any of those things." Id. As was noted earlier, Brenda was also very evasive about her own income during the time that Anita lived with her.
{¶ 67} Brenda's second issue disputes the trial court's findings about her lack of credibility. We have already considered this point in detail and find that Brenda's contention is without merit.
{¶ 68} Brenda also argues that the actions of Brenda and Anita showed that, at the least, an implied agreement existed. Thus, according to Brenda, the trial court erred in failing to find that they entered into an implied contract. Brenda did not raise this point in the trial court, and it has been waived. See, e.g., Cope v. Miami Valley Hosp. , 195 Ohio App.3d 513, 2011-Ohio-4869, 960 N.E.2d 1034, ¶ 36 (2d Dist.). In the trial court, Brenda claimed that she and Anita had an express agreement for the payment for services at the rate of $18 per hour, 24 hours a day, 52 weeks per year. This is inconsistent with an assertion that the parties, instead, entered into an implied contract.
{¶ 69} As a final matter, the trial court did not err in stating that where a close parent-child relationship exists, the care given to a parent is presumed to be gratuitous. In Gould v. Porter , 103 Ohio App. 156, 144 N.E.2d 555 (3d Dist.1956), the court rejected a son's claim that his expenditure of money for the care of his mother was consideration for her conveyance to him of real estate in which she had a life estate with the ability to consume. Id. at 157-159, 144 N.E.2d 555. The court of appeals commented that "[t]he evidence does reveal that the defendant was very solicitous of his mother and gave to her every care that could be expected from a devoted son. However, in this relationship of mother and son there is every presumption that what the son did for his mother was gratuitous and there is nothing in the evidence to rebut such a presumption." Id. at 162, 144 N.E.2d 555.
{¶ 70} The Twelfth District Court of Appeals recently discussed the rationale for the "family member rule" as applied to estates. In re Estate of Bohl , 2016-Ohio-637, 60 N.E.3d 511 (12th Dist.). The court commented that either express or oral contracts can be enforced where a family member provides services to a decedent and claims compensation from the estate. Id. at ¶ 20. However, the contract must be *985 proven by clear and convincing evidence. Id. In this regard, the court noted that:
Under the family member rule, "the general inference or presumption that the rendering of services brings forth an obligation to pay compensation is replaced by the inference or presumption that the rendering of services between family members is gratuitous." Sabin v. Graves , 86 Ohio App.3d 628, 632, 621 N.E.2d 748 (1993) * * *. The presumption that the rendering of services between family members is gratuitous can be overcome by establishing, by clear and convincing evidence, the existence of an express contract that calls upon one family member to perform services for compensation and that calls upon another family member to accept those services and pay for them. Hinkle [v. Sage , 67 Ohio St. 256, 65 N.E. 999 (1902),] at paragraph one of the syllabus. The Ohio Supreme Court explained in Hinkle that the rationale for this rule is that "[c]ases of this kind are odious, and are not favored by the courts, because they afford opportunity for fraud against the estates of deceased persons, and great temptation to perjury, by disappointed or avaricious relatives."
Id. at ¶ 21.
{¶ 71} While this case does not involve a claim against an estate, the same rationale applies. Brenda stated that she loved her mother with all her heart, that she took her mother into her home and cared for her voluntarily, and that she would do the same for her sisters. While Brenda indicated that it would be difficult to care for her mother without compensation, she never asked for compensation before her mother died, and her mother's income did, in fact, support Brenda and her family while her mother lived there. As the court noted, Brenda also received about $415,000 in value from her mother when Anita transferred her own interest in the Kennedy farm to Hard Times Farm in 2013.
{¶ 72} In addition, the testimony indicated that all members of the Kennedy family gave support to their parents without expecting compensation, whether the assistance occurred when Forest had a heart attack and could not farm due to his illness, when family members helped before that with various farming duties, when Forrest lived on his own and received many meals cooked by his daughters, or when Diana and other family members, including Brenda's son, helped with Anita's care. As a result, the trial court did not err in stating that Brenda's care was presumed to be gratuitous.
{¶ 73} Accordingly, the Second Assignment of Error is without merit and is overruled.
IV. Conclusion
{¶ 74} Both of Brenda's assignments of error having been overruled, the judgment of the trial court is affirmed.
DONOVAN, J. and FROELICH, J., concur.

For purposes of convenience, the parties, other than Hard Times Farm, LLC, will be referred to by their first names. Hard Times Farm and Brenda will also be referred to collectively as "Brenda" where appropriate, because Brenda is the sole owner of Hard Times Farm.

Linda settled her claim prior to trial and did not participate further in the case.

Using this figure, the value of the 166 acres at that time would have been $333,220. However, at trial, the parties stipulated that the value of the land at the time of Anita's death was $5,000 an acre. Thus, the total value of the 166 acres was about $830,000.